THE KANSAS CITY SOUTHERN RAILWAY COMPANY, PETITIONER
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

KANSAS CITY SOUTHERN INDUSTRIES, INC., PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 971–72, 974–72, 4788–73.     Filed June 30, 1981.

*Harlow B. King, J. Glenn Hahn, David E. Bass, J. Douglas Irmen,* and *Kip A. Wiggins,* for the petitioners.
*Denis J. Conlon* and *George T. Morse III,* for the respondent.

DRENNEN, *Judge*: These consolidated cases were tried before Special Trial Judge Charles R. Johnston pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. His report was filed on February 1, 1980, and exceptions to the report were subsequently filed by the parties. The Court has duly considered those exceptions and has given appropriate weight to the findings of fact and conclusions of law recommended by Special Trial Judge Johnston. See Rule 182(c) and (d), and the accompanying Note, Tax Court Rules of Practice and Procedure, 60 T.C. 1057, 1149–1150 (1973).

Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 971–72 | Kansas City Southern Railway Co | Jan. 1, 1962– Oct. 31, 1962 | $474,609.07 |

| 974–72 | Kansas City Southern Industries, Inc............... | Jan. 29, 1962– Dec. 31, 1962 | $137,493.77 |
|---|---|---|---|
| | | Dec. 31, 1963 | 469,984.89 |
| | | Dec. 31, 1964 | 115,355.58 |
| | | Dec. 31, 1965 | 240,104.04 |
| 4788–73 | Kansas City Southern Industries, Inc............... | Dec. 31, 1966 | 568,867.65 |
| | | Dec. 31, 1967 | 1,540,332.11 |
| | | Dec. 31, 1968 | 1,038,080.66 |
| | | Dec. 31, 1969 | 2,268,007.70 |

Respondent in docket No. 974–72, by amendment to answer, claimed in the alternative increased deficiencies for the taxable years in issue in the amounts of $168,034.77, $294,491.82, $354,527.96, and $217,732.78; and in docket No. 4788–73, by amendment to answer, claimed in the alternative increased deficiencies for the taxable years in issue in the respective amounts of $470,871.56, $716,606.16, $548,040.34, and $378,545.06.

Petitioner in docket No. 971–72, in its petition, claimed an overpayment in an amount not less than $98,966.37, and in an amendment to petition, claimed an additional overpayment of not less than $81,363. In docket No. 974–72, in its petition, petitioner claimed overpayments for the taxable years in issue in the respective amounts of not less than $165,443, $139,634.49, $290,536.96, and $119,215.10, and in its third amendment to petition, petitioner claimed further increased overpayments for all taxable years in issue in the total amount of $518,186. In docket No. 4788–73, petitioner, in its petition, claimed overpayments for the taxable years 1967, 1968, and 1969 in the respective amounts of $228,112.33, $213,132, and $56,017.50, and in its third amendment to petition, petitioner claimed increased overpayments for all taxable years in issue in the total amount of $711,406.

Other issues having been disposed of by mutual agreement of the parties, the following issues remain for decision:

*Issue I. Carland Rentals.*—Whether the amounts paid or accrued pursuant to written agreements for the lease of equipment are deductible as rentals under section 162(a)(3).[1]

Also involved is a question of whether the amounts paid or

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years at issue.

accrued during the years at issue pursuant to the lease agreements constitute reasonable rentals.

*Issue II. Darby Freight Cars.*—Whether the total costs for certain freight cars qualify for the investment credit under section 38 and for accelerated depreciation under section 167(b) by virtue of meeting the requirements of sections 48(b) and 167(c).

Also involved are various subsidiary questions.

*Issue III. Relay Rail.*—Whether, under the retirement-replacement-betterment method of accounting, the proper amount (i.e., salvage value) to be assigned to rail released from the track system and relaid as additions and betterments (i.e., relay rail) is determined by reference to the cost of the rail or by reference to its fair market value at the time it is recovered.

Also involved is a question of the proper manner in which to determine fair market value.

*Issue IV. Grading Useful Life.*—Whether certain railroad grading has a reasonably determinable useful life and thereby qualifies for ratable depreciation deduction under section 167 and for investment credits under section 38.

Also involved is a question of whether the commencement of ratable depreciation for grading is a change in method of accounting requiring the consent of the Commissioner under section 446(e).

GENERAL FINDINGS OF FACT

Some of the facts have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

Petitioner in docket No. 971–72, the Kansas City Southern Railway Co., sometimes hereinafter referred to as Railway, or petitioner, is a corporation duly organized and existing under the laws of the State of Missouri, with its principal office at 114 West 11th Street, Kansas City, Mo. Its Form 1120, consolidated U.S. Corporation Income Tax Return, for the taxable period involved, January 1, 1962, to October 31, 1962, was timely filed with the District Director of Internal Revenue, St. Louis, Mo.

Petitioner in docket Nos. 974–72 and 4788–73, Kansas City

Southern Industries, Inc., sometimes hereinafter referred to as Industries, or petitioner,[2] is a corporation duly organized and existing under the laws of the State of Delaware, with its principal office at 114 West 11th Street, Kansas City, Mo. Its Forms 1120, consolidated U.S. Corporation Income Tax Return, for the taxable period and taxable years involved in docket No. 974–72, namely, the taxable period January 29, 1962, to December 31, 1962, and the taxable years ended December 31, 1963, 1964, and 1965, were timely filed with the District Director of Internal Revenue, St. Louis, Mo.

Industries' Forms 1120, consolidated U.S. Corporation Income Tax Returns, for the taxable years involved in docket No. 4788–73, namely the taxable years ended December 31, 1966, 1967, 1968, and 1969, were timely filed with the Director of Internal Revenue Service Center, Kansas City, Mo.

Railway was incorporated under the laws of the State of Missouri on March 19, 1900. At all times during the taxable years here in issue, Railway's principal business activity was that of a class I rail carrier, operating rail freight and passenger service between Kansas City, Mo., New Orleans, La., and Port Arthur, Tex. All passenger service was discontinued in 1969.

Industries was incorporated under the laws of the State of Delaware on January 29, 1962. At all times during the period from January 29, 1962, to and including December 31, 1969, Industries' principal business activity was, and is now, that of a parent holding company. Industries is involved herein only by reason of being the common parent of Railway and various other subsidiary companies with respect to the taxable years in issue.

Prior to the formation of Industries in 1962, Railway was the common parent of the consolidated group known as the Kansas City Southern Railway Co. and Affiliated Companies. The consolidated U.S. Corporation Income Tax Return for the taxable year ended October 31, 1962, was the final return for the consolidated group. At the close of that taxable year, the consolidated group consisted of 15 companies as set out on the group's Form 851, Affiliations Schedule. The principal office of each of these corporations was located at 114 West 11th Street, Kansas City, Mo., with the exception of K-M Terminal, the

---

[2] The word "petitioner" is used herein in the singular to refer in context to Railway, to Industries, or to pertinent subsidiaries.

principal office of which was located at 1709 Minnesota Avenue, Kansas City, Kans.

During 1962, Industries issued its capital stock on a two-for-one basis in exchange for 324,868 preferred shares and 982,223 common shares of Railway, representing approximately 91 percent of the total issued voting shares of Railway. This exchange was treated as a pooling of interests, the effect of which was to include in the consolidated financial statements of Industries and its subsidiaries, the consolidated financial statements of Railway and its subsididaries.

The initial consolidated U.S. Corporation Income Tax return for the consolidated group known as Kansas City Southern Industries, Inc., and Affiliated Companies was duly filed for the taxable period January 29, 1962, to December 31, 1962. Industries was the common parent for this taxable period and for all subsequent taxable years here in issue, namely, the taxable years ended December 31, 1963, to December 31, 1969, inclusive. At the close of the taxable year ended December 31, 1962, this consolidated group consisted of 16 companies as set out on the group's Form 851, Affiliations Schedule.

During the taxable years ended December 31, 1963, to December 31, 1969, inclusive, 14 additional corporations became members of the Industries consolidated group. All of the corporations became members of the Industries consolidated group in the years shown on the various Forms 851, Affiliations Schedules, and continued to be members of the group to and including December 31, 1969, except Contracting, which was liquidated on or about September 15, 1965.

The principal office of each member of the Industries consolidated group as described above was located at 114 West 11th Street, Kansas City, Mo., with the exception of K-M Terminal and the following:

| Name | Principal office |
|---|---|
| Southern Enterprises | 1010 Midland Bldg., Kansas City, Mo. |
| Lindgren | 1247 North Askew, Kansas City, Mo. |
| Shreveport TV | 17th Floor Beck Bldg., Shreveport, La. |
| Mid-America Cable TV | 1006 Grand Ave., Kansas City, Mo. |

Mid-America TV .......................... 1006 Grand Ave.,
                                           Kansas City, Mo.
Carthage CV ............................. Box 426,
                                           Carthage, Mo.
Grasis....................................... 5601 Gardner Ave.,
                                           Kansas City, Mo.
American-Coleman........................ 4801 South Nevada Ave.,
                                           Littleton, Colo.

For consolidated tax return purposes with respect to the taxable years ended December 31, 1962, to December 31, 1969, inclusive, the affiliated group was divided into three intermediate affiliated groups consisting of:

(a) Kansas City Southern Industries, Inc. (Industries), and its subsidiary companies (exclusive of those listed in (b) and (c), below);

(b) The Kansas City Southern Railway Co. (Railway) and its subsidiary companies (exclusive of those listed in (c), below); and

(c) Louisiana & Arkansas Railway Co. (L & A) and its subsidiary companies.

The Industries intermediate group referred to above consisted of the following corporations engaged in the kinds of businesses described:

| *Corporation* | *Business* |
|---|---|
| Southern Enterprises | Operator of oil properties |
| Veals | Lessor of equipment |
| Oretta | Lessor of equipment |
| Lindgren | General contractor |
| Mid-America Cable TV | Transmission of television by cable |
| Mid-America TV | Television transmission |
| Shreveport TV | Transmission of television by cable |
| Carthage CV | Transmission of television by cable |
| American-Coleman | Vehicle and vehicle parts manufacture |
| NBRD | Real estate owner and operator |
| Rice-Carden | Real estate owner and operator |
| Grasis | Fabrication and erection of microwave equipment and leasing |
| Fort Smith Enterprises | Real estate investment |
| Pabtex | Leasing and property management |
| Contracting | General contractor |

The Railway intermediate group referred to above consisted of the following corporations engaged in the kinds of businesses described:

| Corporation | Business |
|---|---|
| A & W | Railroad |
| Fort Smith-Van Buren | Railroad |
| K-M Terminal | Railroad |
| Shreveport Terminal | Lessor of terminal facilities |
| KCS Transport | Motor carrier |
| Southern Development | Real estate owner and operator |

The L & A intermediate group referred to above consisted of the following corporations engaged in the kinds of businesses described:

| Corporation | Business |
|---|---|
| L & A | Railroad |
| L & A Transport | Motor carrier |
| Landa | Motor carrier |
| Tolmak | Property holding company |

During the taxable years in issue, Industries' railway system consisted principally of Railway and L & A, which served six Midwestern and Southern States, namely: Missouri, Kansas, Arkansas, Oklahoma, Louisiana, and Texas. Railway operated 894.16 miles of main line track and L & A operated 745.51 miles of main line track. In addition, A & W operated 34.75 miles of main line track between Heavener, Okla., and Waldron, Ark.; Fort Smith-Van Buren operated 20.92 miles of main line track between Coal Creek and Mc Curtain, Okla.; and K-M Terminal operated 5.51 miles of main line track in Kansas City, Kans.

Pursuant to sections 20(1) and (2) of the Interstate Commerce Act, 49 U.S.C.A. sec. 20 (1951),[3] Railway and L & A were required to file Railroad Annual Report Form A with the Interstate Commerce Commission (hereinafter referred to as ICC). Separate Forms A were filed by Railway and L & A for the years ended December 31, 1962, to December 31, 1968, inclusive; a consolidated report was filed for the year ended December 31, 1969. The Railroad Annual Report Form A is a detailed report of annual railroad operations.

The organization of Railway and its subsidiaries prior to the formation of Industries is shown (circa 1962) on the chart on page 1077.

---

[3]Ch. 104, 24 Stat. 379, 386 (1887), as amended by ch. 91, 41 Stat. 456, 493 (1920).

The organization of Industries and its subsidiaries is shown (circa 1969) on the chart on pages 1078–1079.

## Issue I. Carland Rentals

### FINDINGS OF FACT

William Neal Deramus III (Deramus) is the chairman of the board of directors and chief executive officer of Industries. His father was chairman of the board of directors of Railway and was with Railway for over 53 years. Deramus' entire career has been devoted to the railroad industry and related enterprises. He has been employed by the Wabash Railroad Co., the Chicago Great Western Railroad Co. (hereinafter the Chicago Great Western), the Missouri-Kansas-Texas Railway Co. (hereinafter KATY), and Railway, and was president and chief executive officer of each of the latter three railroads. He became president and chief executive officer of Railway and L & A in November 1961.

Prior to and during the years 1964 through 1969, Railway, L & A, NBRD, Carthage CV, and Lindgren (hereinafter collectively referred to as Lessees unless otherwise indicated) acquired equipment through various methods for use in their respective business operations. Since at least 1961, when Deramus became president of Railway and L & A, the Lessees had available to them the following four options for the acquisition of their business equipment: Outright purchase, conditional sales contracts, equipment trusts, and leasing. These alternative methods of equipment acquisition were employed by Deramus during his prior experiences as president of the Chicago Great Western and the KATY and were continued by him in his capacity as president of Railway and L & A.[4]

Throughout his tenures as president of the Chicago Great Western, the KATY, and petitioner, Deramus adhered to a policy of conserving cash. In furtherance of this policy, he primarily utilized conditional sales contracts and leasing for equipment acquisition because these practices required the smallest initial cash outlays.

During the taxable years 1962, 1963, and 1964, Railway and L

---

[4]As previously noted in our general f.ndings of fact. Railway and L & A were operated as a unit during each of the years at issue.

& A entered into certain lease agreements with the so-called Porter companies, consisting of Choctaw Leasing, Inc., the Conestoga Co., Tamarack, Inc., Great Western Enterprises, Inc., and Blackfoot, Inc. (hereinafter collectively referred to as the Choctaw leases). These companies were established by Joseph F. Porter, Jr. (Porter), at the urging of Deramus who, as president of the KATY during 1959 and 1960, desired an additional source of equipment leasing to meet the KATY's requirements. When Deramus became president of Railway and L & A, he also used the Porter companies as a source of equipment leasing for Railway and L & A.

Because the Porter companies were unable to finance the acquisition of all of the equipment needed in Railway's and L & A's business operations, and because of the excessive costs of Railway's current leasing transactions, Deramus, at the time Industries was formed, began to consider the advisability of forming a new corporation which would enable Railway and L & A to lease certain types of equipment which had formerly been leased from the Porter companies.

During 1963, in discussions between Deramus and other employees of petitioner, it was agreed that the formation of a small leasing company would serve the following business interests of petitioner:

(1) Petitioner's various business operations required equipment which was often small in size, large in number, and low in annual acquisition costs ($3 to $5 million). Established leasing companies were unable or unwilling to lease equipment at reasonable rates under these conditions to Lessees. The amounts involved were too small to be financed through conditional sales contracts. A small leasing company would provide Lessees with a source for the acquisition of equipment which Lessees were unable to lease from other leasing companies or directly from the vendors or manufacturers.

(2) The use of a single leasing company for small equipment leasing would also enable Lessees to obtain less expensive lease rates. A single leasing company would be able to consolidate its administrative and clerical costs and legal and accounting fees, whereas these costs would be needlessly duplicated and passed on to Lessees if they leased from several different leasing companies.

(3) A general increase in the amount of Lessees' small

The Kansas City Southern Railway Co. and Subsidiaries and Affiliates Prior to Formation of Industries

The Kansas City Southern Ry. Co. (99% common)[2] (78% preferred)

- Joplin Union Depot Co. — 33⅓%
- Kansas City Terminal Ry. Co. — 8⅓%
  - Neches Bridge, Inc. — 100%
- Texarkana Union Station Trust — 20%
  - Port Arthur Canal & Dock Co. — 100%
  - Kansas & Missouri Ry. & Terminal Co. — 100%
- Southern Development Co. — 100%
  - The Kansas City Shreveport & Gulf Terminal Co. — 100%
  - The Maywood & Sugar Creek Ry. Co. — 100%
    - The Arkansas Western Ry. Co. — 100%
  - Kansas City Southern Transport Co. — 100%
    - Fort Smith & Van Buren Ry. Co. — 100%
- Louisiana & Arkansas Ry. Co. — 100%
  - Landa Motor Lines — 100%
  - Louisiana, Arkansas & Texas Transportation Co. — 100%
    - Tolmak, Inc. — 100%

[1] Percentage ownership is of immediate parent.
[2] 96% owned by Industries directly; 3% by M & A.

equipment leasing was considered desirable because of the complicated procedures Lessees were required to follow if they wished to borrow money to purchase equipment. Railway and L & A were subject to the requirements of the ICC that prohibited rail carriers from borrowing money for longer than a 2-year period without first receiving the approval of the ICC, both prior to seeking a lender and after the lender had been secured and terms agreed upon. To the extent that Railway and L & A could lease small items of equipment which they would otherwise be forced to purchase, they could reduce the time and money required to secure their equipment.

(4) Deramus and his associates were aware of certain Federal income tax benefits available to Lessees, such as the investment credit passthrough and deductions for rentals paid. An increase in small equipment leasing, as opposed to small equipment purchasing, was considered desirable because of the immediate tax savings which equipment leasing would bring.

With these business interests in mind, Carland, Inc. (hereinafter Carland), was incorporated on or about January 9, 1964, under the laws of the State of Delaware. On or about January 14, 1964, Carland's certificate of authority was granted by the State of Missouri. During the taxable years 1964 through 1969, Carland's principal office was located in the Midland Building, 1221 Baltimore, Kansas City, Mo.

In the discussions leading up to the formation of Carland, Deramus and other officials of petitioner determined that Industries would own 75 percent of the common stock of Carland so that Carland would not become a member of the Industries consolidated group; that any allowable investment credit on the leased equipment would be passed through from Carland to Lessees; and that title to the leased equipment would remain in Carland. It was also determined that Lessees were to have no options to purchase the leased equipment; that Carland was to obtain its own financing with respect to procuring the leased equipment; and that Carland was to retain the residual value of the equipment after the leases had terminated.

At the time of Carland's incorporation it was intended, with respect to Carland's leases to Lessees, that the lease rates would be determined so as to allow Carland a 3-percent aftertax return on its gross rental income. This was identical to the intended rate of return agreed upon between Deramus and Porter with

respect to the Porter companies' leases of equipment to the KATY.[5] Also, at the time of Carland's incorporation, it was contemplated that Carland would lease equipment to individuals and businesses other than petitioner and its related corporations. On the leases to unrelated parties, a 6-percent aftertax return was expected.

At all times during the taxable years 1964 through 1969, all of the authorized, issued, and outstanding capital stock of Carland consisted of 100 shares, common, par value $100, owned by Veals, Inc. (hereinafter Veals), a member of petitioner's consolidated group, and by M. T. (Bud) Marqua (hereinafter Marqua), an individual residing at Independence, Mo., as follows:

| Stockholder | Number of shares |
|---|---|
| Veals | 75 |
| Marqua | 25 |
| Total | 100 |

Deramus handpicked Marqua to run the business affairs of Carland. From 1961 to January 31, 1964, Marqua was the chief purchasing agent for Railway, and in that capacity, he purchased all maintenance or roadway equipment, all general supplies, and all roadway supplies (such as ties, rails, and diesel fuel). Also, one of his duties was the selling of scrap, which included scrap rail, scrap rolling stock, and scrap vehicles, such as automobiles. As purchasing agent, Marqua, however, did not enter into the negotiation process concerning equipment leases between Railway and other entities, nor did he enter into discussions with Railway officials concerning whether equipment should be leased or purchased.

During the taxable years 1964 through 1969, the principal business activity of Carland consisted of leasing to Lessees various types of electronic data processing, aviation, railroad rolling stock, railroad roadway maintenance, communication, automotive, and other miscellaneous equipment. In addition, during the years 1964 and 1965, Carland leased to unrelated parties items such as carwash equipment, pool tables, beauty shop equipment, medical equipment, and restaurant equipment.

---

[5]Both the Porter companies and Carland employed the services of Arthur Anderson & Co., certified public accountants, to compute the rental charges necessary to allow the intended 3-percent rate of return.

Carland maintained no stock or inventory of any of this equipment, nor did it have storage or maintenance facilities for such equipment.

During the year 1964, Carland hired a salesman for the purpose of securing leases with businesses other than Lessees and their related corporations. In general, the leases which Carland entered into with unrelated third parties provided that such parties could renew the leases after the primary term for 3 or 4 percent of the original cost of the equipment, or they could purchase the equipment for 10 percent of such cost. By 1966, Carland determined that collection of rentals from parties unrelated to petitioner and Lessees was too costly; thus, this portion of Carland's leasing business was phased out.

During the taxable years 1964 through 1969, Lessees entered into 45 leases with Carland relating to the continued use and possession of various classes of personal property, including rolling stock, auto racks, locomotives and locomotive engines, and roadway maintenance, automotive, communication, electronic data processing, aviation, and other equipment.

These general categories consisted of the following specific types of equipment:

*Rolling stock.*—Boxcars, flatcars, hopper cars, tank cars, gondolas, coaches, dining and lounge cars, business cars, cabooses, locomotives, and locomotive engines.

*Automotive.*—Auto racks, sedans, station wagons, light and heavy trucks, tractors, trailers, and vans.

*Communication.*—Microwave transmitters and receivers, radios, antennas, CATV cables and amplifiers, and television cameras and monitors.

*Aviation.*—Aircraft, aircraft engines and parts, ground service units, aircraft radios, instruments, and navigational aids.

*Roadway maintenance.*—Spike drivers, pullers and setters, tie handlers, sprayers, plug setters and spacers, drills, track wrenches, bolt cutters, jacks, cranes, mowers, welding units, ballast cleaners, rail lifters, weld mowers, push cars, tie spacers, rail saws, and high pressure pumps.

*Other.*—Office furniture, equipment and accessories, air-conditioners, car and truck cleaners.

Of the 45 Carland leases, 42 were with Railway and L & A, and 1 each was with NBRD, Carthage CV, and Lindgren. All of the Carland leases with Lessees contained substantially identical terms and provisions, except for slight modifications which were incorporated into the lease agreements in later years. Fifteen lease agreements were entered into between Carland, as lessor,

and Railway, L & A, and NBRD, as lessees, during the taxable year 1964, and all contained the following provisions:

(a) Identification of the lessor and lessee;

(b) Designation of the primary and renewal lease term;

(c) Designation of the rentals to be paid under the lease;

(d) The manner in which the lessee is to instruct the lessor with respect to specific items of equipment required by the lessee;

(e) Lessee's duty to inspect the equipment and determine its condition within 48 hours of delivery;

(f) Lessee's duty to return the equipment in the same condition in which it was received by the lessee, ordinary wear and tear excepted;

(g) Lessee's obligation to pay rentals not relieved by destruction or damage to the equipment;

(h) Lessee's duty to maintain and repair the equipment at all times;

(i) Lessee's duty to pay all license and registration fees, taxes, assessments, and charges on the equipment, and lessor's right to reimbursement for all said amounts paid by lessor on lessee's behalf;

(j) Lessee's indemnification of the lessor from all claims and liabilities arising out of lessee's use of the equipment;

(k) Lessor's right to be advised as to the location of the equipment and lessor's right to inspect the equipment;

(l) Lessor's election to treat lessee as purchaser of the equipment for purposes of the investment tax credit;

(m) Lessee is under no obligation to order any of the equipment;

(n) Express agreement that the transaction is a lease only and nothing therein shall be construed as conveying any right, title, or interest in and to said equipment other than as a lessee.

Twenty-two lease agreements were entered into between Carland, as lessor, and Railway and L & A, as lessees, during the taxable years 1965 through 1968, and these agreements contained terms and provisions substantially identical to those leases mentioned above, entered into in 1964, except for the following additional provisions:

(o) Lessee's assumption of all risks of loss or damage to the equipment and lessee's duty to immediately notify lessor of any substantial damage;

(p) Lessee's duty to pay all costs, expenses, fees, and charges incurred in connection with the use of the equipment;

(q) An agreement that replacement parts and accessories added to the equipment by the lessee shall become and remain the property of the lessor unless the same can be disconnected from the equipment without impairing the functioning thereof;

(r) The express agreement that the lessee is under no duty to order any of the equipment;

(s) Lessor's right to assign the lease.

Eight lease agreements were entered into during 1967, 1968,

and 1969 between Carland, as lessor, and L & A, Carthage CV, and Lindgren, as lessees, and these agreements contained terms and provisions substantially identical to those leases mentioned above, except for the following additional provisions:

(q)(1) Requirement that, except when alterations or improvements are recommended by the manufacturer, lessee will obtain lessor's written consent prior to making any alterations or improvements to the leased equipment;

(t) Designation of the location of the equipment during the term of the lease;

(u) Prohibition of the lessee from assigning the lease without the prior written consent of lessor;

(v) Definition of default;

(w) Lessee's requirement to ship the equipment, at lessee's sole expense, to a location designated by the lessor upon any termination of the lease;

(l)(1) The omission of any passthrough of the investment tax credit to the lessee.

The terms and provisions of the lease agreements entered into during 1964 through 1969 between Carland and the Lessees were identical to those terms and provisions contained in the leases that Carland entered into during 1964 and 1965 with other lessees not related to, or members of, petitioner's consolidated group.

All of the leases entered into between Carland and Lessees required Lessees to return the equipment which was subject to the leases to Carland upon the expiration of the lease terms. It was the intent of the parties that at the termination of any of the Carland leases, Carland would dispose of and receive any residual value of the leased equipment.[6] None of the leases between Carland and Lessees obligated Lessees to purchase, or contained any provisions extending to Lessees an option to purchase, the equipment which was subject to the leases either during the primary or renewal terms (hereinafter discussed) thereof, after the expiration of the primary or renewal terms thereof, or at any time.

On or about November 1, 1965, Carland acquired by written assignment Choctaw's interest in and to four leases by and between Choctaw, as lessor, and L & A, as lessee, relating to the continued use and possession of certain rolling stock and

---

[6] Throughout all of the lease transactions, it was the understanding and intent of the president of Carland that the transactions were strictly leases and that Carland was, and was to act as the legal and equitable owner of the equipment subject to the Carland leases.

roadway maintenance equipment, and Choctaw's interest in and to two leases by and between Choctaw, as lessor, and Railway, as lessee, relating to the continued use and possession of certain rolling stock and auto racks.

The Choctaw leases which Carland acquired in 1965 contained the following provisions:

(a) Identity of lessor and lessee;

(b) Designation of lease term and rentals;

(c) Lessee's responsibility for all operating costs and expenses incurred in connection with the use of the equipment;

(d) Lessee's duty to return the equipment in as good a condition as when received by lessee, ordinary wear and tear excepted;

(e) Lessee's indemnification of lessor from all liabilities and claims arising out of the use of the equipment;

(f) Provisions relating to default;

(g) Lessor's privilege of making periodic inspections of the equipment;

(h) Lessor's right to affix appropriate markings indicating its ownership of the equipment;

(i) Lessee's duty to pay all taxes on the equipment;

(j) Lessor's agreement to treat the lessee as the purchaser of the equipment for purposes of the investment tax credit;

(k) Lessee's duty to comply with all laws, regulations, rules, and orders of lawfully constituted authorities;

(l) Agreement that title to the leased equipment remains in the lessor, and prohibition of lessee from mortgaging, pledging, or encumbering the leased equipment.

None of the Choctaw leases contained provisions extending to Lessees an option to purchase the equipment which was the subject of the leases.

At all times during the terms of the leases between Carland and Lessees, and at all times during the terms of the Choctaw leases purchased by Carland, legal title to the equipment subject to these leases was in Carland. At no time during the terms of said leases was legal title to the equipment in Lessees.

During the taxable years 1964 through 1969, Carland financed its equipment purchases through loans, principally from Chemical Bank New York Trust Co., a New York banking corporation; Commercial National Bank, a Louisiana banking corporation; Grand Avenue Bank & Trust Co., a Missouri banking corporation; and the former City National Bank & Trust Co., now the United Missouri Bank of Kansas City, N.A., a Missouri banking corporation (hereinafter collectively referred to as the banks). It was the general practice that after the Lessee made application

to Carland for specific items of equipment, Carland would procure a loan from one of the banks in an amount necessary to enable Carland to purchase the required equipment from a vendor. To evidence the loan, Carland gave its note to the bank, and to secure payment of the note, Carland assigned certain of its leases to the bank involved.

Although Lessees consented to the assignment of the Carland leases to the respective banks as security, no Lessee at any time guaranteed payment of the Carland notes. Further, Carland at no time borrowed money from Lessees to enable it to purchase the equipment to be leased.

The financing periods which Carland was able to obtain for repayment of its loans were generally 3 to 5 years. With few exceptions, Carland was unable to borrow money for longer than a 5-year period. Except for two instances, the Carland leases with Lessees had either 3-year primary terms and five 1-year renewal options or 5-year primary terms and three 1-year renewal options. One of the leases had a primary term of 4 years and four 1-year renewal options, and another lease had an 8-year primary term and three 1-year renewal options. In all of the leases, the option as to whether or not to renew was in the Lessee.

Carland's leases with Lessees were structured in such a manner that Carland would recover 100 percent of the cost of the equipment plus a 3-percent aftertax return on its gross rental income over the primary term of the lease. Specifically, the rent was determined by applying an annual or monthly rental factor to the lessor's actual cost per unit of equipment. In this respect, the lease agreements provided as follows:

The term "actual cost" with respect to a unit shall mean either the lessor's unit price or the lessee's unit price applicable to such unit whichever shall be lesser, including the equipment and accessories which the lessee desires to be included or installed thereon as stated in the order applicable thereto.

The types of equipment generally subject to 3-year primary lease terms included automobiles, light trucks, and certain miscellaneous light equipment. The types of equipment generally subject to 5-year primary lease terms included rolling stock, auto racks, locomotives and locomotive engines, medium and heavy trucks, and roadway maintenance, communication, electronic data processing, aviation, and other heavier types of equipment.

The annual rental factors for leases with primary terms of 3 and 5 years were approximately 37 percent and 24 percent, respectively. For those leases entered into before April 1, 1966, the annual rental factor after expiration of the primary term was 0.5 percent. For those leases entered into on or after April 1, 1966, the annual renewal rate was 1 percent. The increase in renewal rates was due primarily to Carland's increased cost of bookkeeping.

Through the use of records maintained by their various departments and through communications with Carland, Railway and L & A were generally able during the terms of their leases with Carland to ascertain the location of the larger items of leased equipment such as rolling stock and automotive equipment. With respect to the smaller items of equipment leased from Carland, such as roadway maintenance equipment, Railway's and L & A's engineering departments regularly recorded in their books a description of each item of equipment, the maintenance of way (hereinafter MW) number assigned to it, the manufacturer's serial number of the equipment, the location and use of the equipment, and a notation as to whether the equipment was owned by the Lessee or was being leased from Carland. Railway's and L & A's engineering departments instructed their employees, as part of the identification and recordkeeping procedures, to stencil the assigned MW number on each item of equipment which was acquired by the department. If an item of equipment was too small to be stenciled, the item was identified by the manufacturer's serial number. The above-mentioned records were maintained to enable Railway and L & A to distinguish between equipment which they owned and equipment which they had leased from Carland and to facilitate the location of any item of equipment leased from Carland or to record the fact that it had been destroyed or returned to Carland.

Carland maintained its own records for the purpose of enabling it to locate the equipment it leased to Lessees and to identify each item of equipment to the original agreement under which the equipment was leased. As part of its records, Carland maintained an annual equipment list reflecting for every item of equipment leased to Lessees, the description and serial number, the unit number assigned by the Lessee, the lease number, invoice number, date of the lease, rental figures, and equipment

costs. These annual equipment lists were prepared and used solely for purposes of identifying and locating Carland's leased equipment, and were not relied upon for purposes of ascertaining equipment costs or annual rentals.

Carland annually provided a copy of its equipment list to Railway and L & A for the purpose of verifying the accuracy of the records of Carland and Lessees. Through the use of its records, Carland was able to determine whether an item of equipment was still under lease, had been returned, or was sold.

During the terms of the Carland leases, the Lessees did not, in general, sell, scrap, or in any other manner dispose of the equipment subject to the leases. The exception, however, was where a leased item was destroyed or wrecked on a foreign railroad line. In this instance, the Lessee involved would notify Carland of such destruction or wreckage and act as a conduit for receipt of the proceeds from the sale of the scrap.

Under the provisions of the lease agreements, Lessees had a duty to return the equipment at the end of the primary term of the lease or at the end of any renewal period. In instances where an item of leased equipment was destroyed or became no longer useful due to a change in the nature of a Lessee's business,[7] the equipment (or proceeds from the sale of the scrap) was returned before the end of the primary term of the lease. However, on these occasions, Lessees remained obligated under the provisions of the lease agreements to pay rent during the full primary term, and Carland generally extracted the rental due over the remainder of the primary term.

Typically, an item of leased equipment was retained by the Lessees during the renewal period so long as that item remained functional, was not too costly to maintain, or did not become outmoded. On several occasions, an item of leased equipment was retained even after the expiration of primary and renewal terms prescribed by the lease because of that item's continued usefulness to the particular Lessee.

During the term of any renewal period under the Carland leases, Lessees paid to Carland the renewal amount of rent that

---

[7]For example, around 1968, petitioner tried to enter the airline business on a basic level and, as a result, leased certain aviation equipment from Carland. As this venture proved financially disastrous for petitioner, the airline service was phased out over the following 2 or 3 years and much of the leased aviation equipment was returned to Carland during that period.

was negotiated either at the execution of the lease or at the time of a later renewal. The Lessees at no time retained any equipment subject to the Carland leases for which rentals were not paid thereon to Carland.[8]

Upon expiration or cancellation of the leases, or return of certain equipment subject to its leases, Carland disposed of such equipment by sale, realizing income on its residual value. Carland's net gains realized from disposal of certain equipment that had previously been subject to its leases varied from 2.53 percent to 9.74 percent of Carland's gross revenues during the years 1970 to 1974. During the years 1965 through 1974, Carland received $1,644,442, or approximately 26 percent of the original cost of $6,377,675, from the sale of equipment previously subject to its leases with Lessees.

Carland and Lessees entered into no side agreements or understandings relating to the purchase by Lessees of the equipment which was the subject of the leases and, for the most part, Carland did not sell the leased equipment to Lessees at the end of the leases. There were, however, a few isolated sales to Lessees at various times. The majority of such transactions were the result of the leased equipment being destroyed on either a Lessee's line or on a foreign line. When equipment subject to a Carland lease was destroyed on a foreign line, Carland issued an invoice to the Lessee, the Lessee received a formula amount of money from the foreign railroad, paid Carland for the destroyed equipment, and kept the salvage returned by the foreign railroad.

Carland was not financially able to arrange for the purchase and subsequent lease to Lessees of all of the equipment which Lessees required in their respective businesses. During the years 1964 through 1969, Lessees leased and purchased through conditional sales agreements from parties other than Carland, equipment having total acquisition costs of $77,094,697. During those same years, Lessees leased from Carland equipment having total acquisition costs to Carland of $14,763,716.93.

The leases entered into between Lessees and Carland during 1964 through 1969 were commonly known in the leasing industry

[8]In the leasing industry during 1964 through 1969, the practice of a lessee's continuing to rent the property beyond the term of the primary and renewal options on the lease was not uncommon.

as "financing leases," i.e., a lease which allows the lessor to recover his total cost in the property subject to the lease plus receive some rate of return on his investment. In the leasing industry during 1964 through 1969, the absence of a purchase option in a lease which provided that the lessor would recover his cost of the leased equipment over the primary and renewal terms of the lease was not unusual. Further, it was not uncommon for a lessee under a financing lease to continue to rent, at a minimal rate, the property subject to the lease beyond the term of the primary and renewal options on such lease.

The lease rates paid by Lessees to Carland during the primary terms of the Carland leases were equal to, and in many cases less than, the rates that Lessees would have had to pay if Lessees had entered into similar leases with parties other than Carland during those years.

During the taxable years 1964 through 1969, Carland maintained its books and reported its income on a calendar year, accrual basis. All amounts paid or accrued to Carland during said taxable years pursuant to its lease agreements were recorded on Carland's books in an account for rental income, and were reported as income from "rents" on its Federal income tax returns. Carland also claimed depreciation deductions on its returns with respect to its costs in the items of equipment which were the subject of its leases.[9] Carland paid no State or local sales taxes of any kind upon the amounts received under the leases of its equipment for which Carland was not reimbursed by Lessees.

The amounts paid or accrued by Lessees during the taxable years 1962 through 1969 pursuant to all of the equipment leases entered into with Carland and other leasing companies were claimed by petitioner as deductions for "rents" on its Federal

---

[9]Carland used the income forecast method of depreciation which matches the depreciation of the equipment with the income received from that equipment. Using this method of depreciation, Carland, in accordance with its financial statements, claimed depreciation in the following amounts for the years 1964 through 1969:

| Year | Depreciation | Rental income |
|------|--------------|---------------|
| 1964 | $464,575.97 | $555,050.90 |
| 1965 | 1,045,327.76 | 1,260,456.28 |
| 1966 | 1,635,182.07 | 2,029,271.51 |
| 1967 | 2,097,960.39 | 2,612,532.93 |
| 1968 | 2,477,047.00 | 3,113,553.00 |
| 1969 | 2,581,383.00 | 3,282,977.00 |

income tax returns for each of those years. On its Federal income tax returns for each of the taxable years 1962 through 1969, petitioner did not claim depreciation deductions with respect to the items of equipment which were the subject of the leases entered into with Carland or with other leasing companies.

In the notices of deficiency in docket No. 974–72 and docket No. 4788–73, respondent made the following determination:

Rental expense (Carland, Inc. leases) is adjusted to allow a deduction based on the guideline life of the assets rather than the primary term of the lease * * *

The amounts claimed as rental deductions by petitioner with respect to the taxable years 1964 through 1969, and the amounts disallowed by respondent in his notices of deficiency are as follows:

| Taxable year | Rental deduction claimed | Amounts disallowed |
|---|---|---|
| 1964 | $334,304.98 | $158,372.11 |
| 1965 | 819,146.48 | 379,949.15 |
| 1966 | 1,576,110.00 | 623,005.31 |
| 1967 | 2,446,618.35 | 1,073,309.69 |
| 1968 | 2,971,277.12 | 1,193,872.87 |
| 1969 | 3,420,220.87 | 1,253,886.97 |

## ULTIMATE FINDINGS OF FACT

The amounts paid or accrued to Carland by Railway, L & A, NBRD, Carthage, and Lindgren, pursuant to certain written agreements, during the taxable years ended December 31, 1964, to December 31, 1969, inclusive, were properly deductible by petitioner on its consolidated U.S. Corporation Income Tax Returns for said years under the provisions of section 162(a)(3) as rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which Railway, L & A, NBRD, Carthage, and Lindgren were not taking title or in which they had no equity.

### Issue I. Carland Rentals

#### OPINION

The question presented is whether amounts paid or accrued to Carland by Lessees (Railway, L & A, NBRD, Carthage CV, and Lindgren), pursuant to written agreements which in form were

straight leases, were properly deductible during the taxable years in issue by petitioner on its consolidated Federal income tax returns as rental under section 162(a)(3).[10] That section provides that rental payments are deductible if the payments are for the "continued use or possession" of property to which the "taxpayer has not taken or is not taking title or in which he has no equity."

The parties have stipulated that at no time during the terms of the leases was legal title to the items of equipment which were subject to those leases in Lessees. Thus, the instant issue boils down to whether during the terms of the leases, Lessees had or were acquiring an "equity" in the equipment.

Respondent argues that the 51 lease agreements between Lessees and Carland, a related entity, were, in substance, deferred payment agreements under which the Lessees were acquiring an equity in the hundreds of pieces of equipment covered by those agreements. Stated differently, respondent argues that the transactions at issue were purchases of equipment rather than leases. Consequently, respondent contends that petitioner's claimed deductions in excess of ratable depreciation should be disallowed.[11]

Petitioner argues that Carland was formed and operated throughout the taxable years in issue solely for the purpose of leasing business equipment and that Lessees and Carland intended, for good business reasons, to enter into transactions which were, in form and substance, leases and not purchases of equipment. We believe petitioner has the better side of the argument.

The case law concerning whether a transaction is a lease or a purchase is by no means a paragon of clarity. Numerous cases have considered whether an agreement which was in form a

---

[10]Sec. 162(a) provides in part:

There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\*          \*          \*          \*          \*          \*          \*

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

[11]Respondent does not rely on sec. 482 as a basis for the proposed adjustment. Respondent attempted to raise sec. 482 by second amendment to answer. Petitioner filed a motion to strike to which respondent filed a notice of no objection. Petitioner's motion was granted.

lease was in substance a sale for purposes of determining whether income should be reported by a taxpayer as rental receipts or income from the sale of property, and for purposes of determining whether a taxpayer was entitled to deduct amounts paid as rent or was required to consider the amounts as a capital investment in property purchased and recover the investment through depreciation deductions with respect to the property.

It is clear that the labels employed by the parties to a transaction are not controlling and that the substance of the transaction, rather than its form, is determinative. *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978); *Helvering v. Lazarus & Co.*, 308 U.S. 252 (1939). See also *Estate of Starr v. Commissioner*, 274 F.2d 294, 295 (9th Cir. 1959), revg. on other grounds 30 T.C. 856 (1958). As we pointed out in *Belz Investment Co. v. Commissioner*, 72 T.C. 1209, 1225 (1979), on appeal (6th Cir., Feb. 26, 1980)—

The focus is the practical effect of the transaction, not its technical effect. *Northwest Acceptance Corp. v. Commissioner*, 58 T.C. 836 (1972), affd. per curiam 500 F.2d 1222 (9th Cir. 1974); *Martin v. Commissioner*, 44 T.C. 731 (1965), affd. on this issue 379 F.2d 282 (6th Cir. 1967).

Although it is agreed that the substance of the transaction is controlling, courts have focused on different factors to determine the substance of a particular transaction. One factor emphasized is the parties' intent, as gleaned from the facts and circumstances existing at the time of the transaction, including the economic realities. *Breece Veneer & Panel Co. v. Commissioner*, 232 F.2d 319 (7th Cir. 1956), revg. 22 T.C. 1386 (1954); *Oesterreich v. Commissioner*, 226 F.2d 798 (9th Cir. 1955), revg. a Memorandum Opinion of this Court; *Benton v. Commissioner*, 197 F.2d 745 (5th Cir. 1952), revg. a Memorandum Opinion of this Court; *Northwest Acceptance Corp. v. Commissioner, supra.* Other decisions have analyzed transactions in terms of whether the economic realities indicate that traditional business relationships of lessor-lessee were created. *Sun Oil Co. v. Commissioner*, 562 F.2d 258 (3d Cir. 1977), revg. a Memorandum Opinion of this Court. Another decision emphasized the nonsham nature of the transaction. *American Realty Trust v. United States*, 498 F.2d 1194 (4th Cir. 1974).

In determining whether a transaction is a lease or a purchase, its effect on both parties to the transaction must be analyzed. The general business of the lessor and the manner in which it is conducted must be examined. *Lockhart Leasing Co. v. Commissioner*, 446 F.2d 269, 272 (10th Cir. 1971), affg. 54 T.C. 301 (1970). "[S]o long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction adopted by the parties governs for tax purposes." *Frank Lyon*

*Co. v. United States, supra* at 584. On the other hand, where the lessee, as a result of the rent payments, acquires something more than the mere use of the property, he is building up an equity in that property, and the payments, though denominated "rent" in the lease instruments, do not fall within the definition of that term in the statute. *Lester v. Commissioner*, 32 T.C. 711, 721 (1959); *Haggard v. Commissioner*, 24 T.C. 1124, 1129 (1955). In fact, since most transactions exhibit a variety of circumstances which point in opposite directions, the cases have been decided on the basis of all of the facts and circumstances there presented. Cf. *Martin v. Commissioner*, 44 T.C. 731, 741 (1965), affd. on this issue 379 F.2d 282 (6th Cir. 1967). The cases recognize that the motive or intent of the parties is significant and that such intent must be determined not by how the parties framed the transaction but rather by the practical effect of the agreements entered into by them. See *Lockhart Leasing Co. v. Commissioner*, 54 T.C. at 313.

In light of the facts and circumstances surrounding the formation of Carland, the facts and circumstances which existed at the time the written agreements between Carland and Lessees were entered into, and the form and practical effect on the agreements, we cannot conclude that Carland and Lessees intended that Lessees should acquire an equity in the equipment by the payments under the agreements.

In the instant case, 51 lease agreements were entered into between Carland and Lessees from 1963 through 1969, and all of the agreements contained substantially identical terms and provisions.[12] There can be no question that the clear and unambiguous terms of the instruments "create the usual obligations found in a straight lease agreement." See *Western Contracting Corp. v. Commissioner*, 271 F.2d 694, 699 (8th Cir. 1959), revg. a Memorandum Opinion of this Court. Thus the parties, in form, intended the transactions at issue to be leases, and our analysis necessarily centers around the substance of those transactions.

Carland's formation primarily served three business functions. First, since it was his policy to conserve cash, Deramus, president of Lessees, normally utilized conditional sales contracts and

---

[12]This figure includes the six Choctaw leases with Lessees which Carland acquired in 1965.

leasing agreements for equipment acquisition. Petitioner's various business operations required equipment which was often small in size, large in number, and low in annual acquisition cost. However, petitioner had difficulty in leasing (either directly or through the Porter companies) these items at reasonable rates from established leasing companies. Furthermore, since the acquisition amounts involved were small, petitioner could not finance the items through conditional sales contracts. Thus, Carland was formed to meet this leasing need.

Second, Deramus did not want to borrow money to acquire these items because ICC approval was required on loans exceeding 2 years. This alternative was undesirable not only because the process of obtaining ICC approval could prove to be time consuming and expensive, but also because relatively small amounts of money ($3 million to $5 million) were involved and the need for these types of equipment arose frequently. Petitioner hoped to sidestep this problem through Carland's incorporation.

Third, for those few items which Lessees could obtain through satisfactory leases, Lessees were required to deal with a number of lessors, thereby incurring duplicated administrative and clerical costs and legal and accounting fees. Carland was formed to consolidate and minimize such costs.

During 1964 and 1965, Carland entered into a few leases with third parties other than Lessees, but by 1966, this practice of leasing to parties unrelated to petitioner was being phased out because it became too costly. Carland was not financially able to arrange for the purchase and subsequent lease to Lessees of all of the equipment which Lessees needed. During 1964 through 1969, Lessees leased from parties other than Carland and purchased through conditional sales contracts equipment having an acquisition cost of $77,094,697, while leasing from Carland equipment having an acquisition cost to Carland of $14,763,716.93. Thus, in terms of cost, Lessees obtained 84 percent of their equipment from parties other than Carland during those years.

Taking into consideration the sound business reasons discussed above, the fact that Carland, at least on a limited basis, leased equipment to unrelated third parties, and the fact that Carland played a minor role in the overall equipment acquisition

program of Lessees, we find that Carland was formed to engage solely in the equipment leasing business.

Turning our attention to the terms of the lease agreements and the conduct of the parties, we find other factors which indicate that the equipment which was the subject of the agreements was being leased by intent and in actuality. None of the lease agreements at issue obligated the Lessees to purchase, or contained any provisions extending to the Lessees an option to purchase, the equipment which was the subject of the leases either during the primary or renewal terms thereof, or after the expiration of those terms. The Carland leases did not involve real estate or fixtures but rather such items as automobiles, freight cars, maintenance equipment, and other easily movable equipment. In practice, the equipment was in general returned to, and not retained by, Carland.[13] Compare *Estate of Starr v. Commissioner, supra,* and *Mt. Mansfield Television, Inc. v. United States,* 239 F. Supp. 539 (D. Vt. 1964), affd. per curiam 342 F.2d 994 (2d Cir. 1965), cert. denied 382 U.S. 818 (1965), with *Lockhart Leasing Co. v. Commissioner,* 54 T.C. 301, 313–314 (1970), affd. 446 F.2d 269 (10th Cir. 1971).

In those few instances where an item of leased equipment was destroyed on a Lessee's railroad line or a foreign line, or became no longer useful due to a change in the nature of a Lessee's business, the equipment (or proceeds from the sale of the scrap) was returned before the end of the primary term of the lease. However, on these occasions, the lessor continued to act in the traditional lessor status. Under the terms of the lease agreements, Lessees remained obligated to pay rent during the full primary term and, in general, Carland extracted the rental due over the balance of that term.

During the terms of the leases, Lessees could not, and except for exceptional occasions,[14] did not dispose of the equipment. All

[13]There were a few isolated sales to Lessees. However, the majority of these transactions were the result of the leased equipment's being destroyed on either a Lessee's railroad line or a foreign line. When equipment subject to a Carland lease was destroyed on a foreign line, the Lessee received a formula amount from the foreign line, paid Carland for the destroyed equipment, and kept the salvage returned by the foreign railroad.

[14]An exception was where a leased item was destroyed or wrecked on a foreign railroad line. On such occasion, the lessee would notify Carland of such destruction or wreckage and act as a conduit for receipt of the proceeds from the sale of the scrap.

of the Carland leases required Lessees to return the equipment to Carland upon expiration or cancellation of the leases.[15] Carland did, in fact, dispose of such equipment by sale, realizing substantial income on its residual value.[16]

Further evidence that Carland and Lessees intended for the transactions to be leases and not sales is the elaborate procedures utilized independently by each party to identify and locate the numerous items of equipment subject to the Carland leases. Lessees used various methods of identification depending on the size of the particular piece of equipment. With respect to larger items of equipment such as rolling stock and automotive equipment, Lessees maintained records through which they could at all times know the location of such equipment leased from Carland. With respect to small items of equipment, such as roadway maintenance equipment, Lessees' respective engineering departments maintained records containing a description of the equipment, the location and use of the equipment, the assigned maintenance-of-way number, and the manufacturer's serial number.

Carland also maintained its own records, including an annual equipment list of every item of equipment still under lease to Lessees. For the purpose of locating leased equipment and identifying each item of equipment with respect to its lease agreement, Carland's records contained a description and serial number of each item, a unit number assigned by the Lessee, the lease number, invoice number, date of the lease, rental figures, and equipment cost. For the purpose of verifying the accuracy of the records of both Carland and the Lessee, the Lessees annually received a copy of Carland's equipment list.

We believe such detailed independent recordkeeping on the part of Carland and Lessees demonstrates that the parties were protecting their respective interests. These procedures were

---

[15]The record shows that some items of equipment were returned during the primary term of the lease and some were returned after the primary and renewal terms of the lease. However, the vast majority of the items were returned after the expiration of the primary and/or renewal terms in accordance with the provisions of the lease.

[16]During the taxable years 1970 through 1974, Carland's net income from gains on the disposal of certain equipment that had previously been subject to its leases ranged from 2.53 percent to 9.74 percent of its gross revenues. During the years 1965 through 1974, Carland received $1,644,442, or approximately 26 percent of the original cost of $6,377,675, from the sale of equipment previously subject to its leases with Lessees.

used by Carland to see that it collected rent on all property still under lease and to insure the return of the property at the end of the lease in order to obtain the residual value. The procedures were used by Lessees to insure that they were not still paying rent on equipment that had been returned to Carland.

With respect to procuring the equipment to be leased to Lessees, Carland obtained its own financing. Although Lessees consented to the assignment of the Carland leases as security for the banks which were lending money for Carland's equipment purchases, no Lessee at any time guaranteed payment of the Carland notes, and Carland at no time borrowed money from Lessees. Cf. *Western Contracting Corp. v. Commissioner, supra* at 696, 697 (where financing procedures followed by equipment leases were substantially the same as those in the instant case).

Respondent argues that in essence when Carland was formed "the petitioner corporation simply spun off and incorporated its purchasing department" and that the terms of the leases subsequently entered into with Carland were "motivated by federal tax consequences." To be sure, Deramus and his associates were aware of certain Federal income tax benefits available to the Lessees, such as the investment credit pass-through and deductions for rentals paid. Also, in the discussions leading up to the formation of Carland, those officials recognized that an increase in small equipment leasing, as opposed to small equipment purchasing, was desirable because of the immediate tax savings which equipment leasing would bring.

However, it is well settled that consideration of tax effects of business arrangements is often essential to the success of any business, and taxpayers may arrange their affairs so that their taxes may be as low as possible: *Gregory v. Helvering,* 293 U.S. 465 (1935). What the parties actually do, other than what they might have done, controls their liability. *Seminole Flavor Co. v. Commissioner,* 4 T.C. 1215, 1235 (1945). Moreover, it is clear from the discussion above that substantial business reasons existed for the creation and operation of Carland as an equipment leasing entity.

Respondent also argues that although the leases contained no purchase options, the renewal rentals were "nominal in amount" and that the "lessees retained the equipment and used it during its entire useful life and also during its entire economic life." We believe that respondent's latter assertion lacks merit and,

although we agree that substantial variances existed between the primary and renewal term rentals, we do not think that the existence of such renewal rates, taken in conjunction with other facts present herein, disqualifies the transactions at issue as leases.

To begin with, respondent made no effort at trial of the Carland issue to establish either the "entire useful life" or the "entire economic life" of the numerous items of equipment which were the subject of the 51 leases. It is true that Lessees continued to rent certain items of equipment beyond the expiration of the primary and renewal terms.[17] However, as petitioner's expert witness' uncontradicted testimony points out, such an informal practice was not uncommon in the leasing industry during the years at issue for leases whose provisions were similar to those involved herein. Moreover, respondent isolates the facts surrounding these relatively few pieces of equipment and totally ignores the hundreds of pieces of equipment which Lessees returned to Carland, and which were sold by Carland for significant amounts, either at the end of the primary term of the lease or during one of the renewal terms stated in the lease. Also, respondent ignores those instances in which Lessees returned equipment with substantial residual value and remaining utility to Carland before the end of the primary term of the lease.[18] Finally, we think that it is important that in virtually all instances the equipment (or proceeds from the sale of the scrap) was returned to Carland. Thus, Carland at all times retained a realistic residual interest in the equipment and, in fact, was able to capitalize on such interest. Lessees at no time acquired the full economic interest in the equipment.

To be sure, options to renew at a nominal rental have disqualified leases. Specifically, respondent relies on *Estate of Starr v. Commissioner, supra,* where an option to renew a lease for a 5-year term at the end of a 5-year lease, for a rental equal

---

[17]At the time of the trial of the Carland issue, a sizable number of the 51 leases in issue had not reached the state where the primary and renewal terms had expired.

[18]In a few instances where Lessees discontinued a certain line of business (primarily with respect to electronic data processing equipment and aviation equipment), they returned the equipment to Carland before the end of the primary term of the lease. The residual value realized by Carland on the sale of such equipment amounted to approximately 57 percent of the total residual value realized by Carland during 1964 through 1974.

to approximately 3 percent of the annual base rental, supported the denial of the rental deduction. Similarly, respondent relies on *Mt. Mansfield Television, Inc. v. United States, supra,* where the presence of 10 annual renewal options at annual renewal rates equal to the monthly rental for the 5-year base term of the lease led to the denial of the deduction. On the other hand, petitioner relies on *Lockhart Leasing Co. v. Commissioner, supra,* and *LTV Corp. v. Commissioner,* 63 T.C. 39 (1974), where renewal rates similar to those in the above cases failed to disqualify the transactions as leases.

After reviewing these cases, we believe that *Estate of Starr* and *Mt. Mansfield Television, Inc.,* are easily distinguishable from the instant case.[19] In all significant respects, the relevant facts presented herein resemble (and in some respects are more favorable than) those in *Lockhart Leasing Co.* and *LTV Corp.,* and these latter cases amply support treating the transactions at issue as leases.

During the taxable years 1964 through 1969, Carland financed its equipment purchases through loans from various banks. The usual practice was that, after the Lessee made application to Carland for specific items of equipment, Carland would procure a loan from a bank in an amount necessary to enable Carland to purchase the required equipment from a vendor.[20] In general, the financing periods which Carland was able to obtain for repayment of its loans were 3 to 5 years. In general, Carland was unable to borrow money for longer than a 5-year period.

Correspondingly, except for only two instances,[21] the Carland leases with Lessees had either 3-year primary terms and five 1-

---

[19]In *Estate of Starr v. Commissioner,* 274 F.2d 294 (9th Cir. 1959), revg. 30 T.C. 856 (1958), involving a fire sprinkler system installed in a manufacturing plant, and in *Mt. Mansfield Television, Inc. v. United States,* 239 F. Supp. 539 (D. Vt. 1964), affd. per curiam 342 F.2d 994 (2d Cir. 1965), cert. denied 382 U.S. 818 (1965), involving microwave equipment installed in a television station, the nature of the leased property, itself, coupled with the bargain renewal option, indicated that the property would remain the lessee's at the end of the lease. In the instant case, the leased equipment was easily returnable, and the practice of the parties indicates that the equipment was returned and, for those leases which had not expired at the time of trial, would be returned.

[20]In *Lockhart Leasing Co. v. Commissioner,* 54 T.C. 301 (1970), affd. 446 F.2d 269 (10th Cir. 1971), the lessor borrowed money to finance its leasing business.

[21]One lease had a primary term of 4 years with four 1-year renewal options, and another lease had an 8-year primary term and three 10-year renewal options. The primary terms of these leases corresponded with the period of the loans procured from the particular bank.

year renewal options or 5-year primary terms and three 1-year renewal options.[22] The annual rental factors for leases with primary terms of 3 and 5 years were approximately 37 percent and 24 percent of the equipment costs, respectively. Such rental rates allowed Carland to recoup the cost of the equipment plus a 3-percent return on its investment over the primary term of the leases with Lessees. The annual renewal factors ranged from 0.5 percent of the equipment's original cost for the leases entered into before April 1, 1966, to 1 percent of the original cost for those leases entered into on or after that date.[23] No Lessee at any time guaranteed payment of the Carland notes.[24]

We find no evidence in the record which indicates that the banks which financed Carland's purchase of equipment were in collusion with Carland or Lessees. Those banks were independent of Carland and Lessees, and their action in setting the period of the loans to Carland had a very real effect on the lease terms written into the agreements between those parties. Since Carland was formed to engage solely in the business of leasing equipment and, from the outset, had little working capital,[25] that entity, in order to pay off its indebtedness to the banks, was compelled to recoup the cost of the equipment over the period of the loans. Thus, the method adopted by the parties, at least during the primary term of the leases, would seem to be the only way to compute the rental. In effect, Lessees paid Carland the purchase price of the equipment plus interest and a profit during the primary term in return for the continued use of the property at a lower rental over the renewal terms of the leases.

In similar circumstances, this Court has upheld lease transactions where it has appeared that the total rentals over the term

---

[22]In *Lockhart Leasing Co. v. Commissioner, supra,* slightly less than one-half of the leases in issue were for terms of 36 months or less. Most of the remaining leases were for a period of 60 months. 54 T.C. at 306. The lease in *LTV Corp. v. Commissioner,* 63 T.C. 39, 42 (1974), was for a term of 60 months.

[23]In *Lockhart Leasing* the leases gave the lessees an option to renew the lease on a year-to-year basis upon expiration of the primary term with an annual renewal rental equal to the monthly rental during the original period. The leases also contained options to purchase, and almost all of the leased equipment was purchased from the lessor at the end of the lease. The lease in *LTV Corp.* gave the lessee therein a renewal option of indefinite duration; the annual renewal rate was approximately 4 percent of the original cost of the leased equipment. The lease also contained an option to purchase.

[24]The absence of guarantees has some significance. See *Lockhart Leasing v. Commissioner,* 54 T.C. at 314–315.

[25]Carland was originally formed with a $10,000 capital investment.

of the lease have equaled or exceeded the cost of the equipment. See *LTV Corp. v. Commissioner*, 63 T.C. at 50–51; *Northwest Acceptance Corp. v. Commissioner*, 58 T.C. 836, 849 (1972), affd. per curiam 500 F.2d 1222 (9th Cir. 1974);[26] *Lockhart Leasing Co. v. Commissioner, supra* at 306.

Indeed, we recognize that the treatment of some items of equipment does not accord with the strict terms of the lease agreements. However, on the overall record, we believe that the transactions at issue have economic substance, were encouraged by business realities, are imbued with tax-independent considerations, and were not shaped solely by tax-avoidance features that have meaningless labels attached. Cf. *Frank Lyon Co. v. United States*, 435 U.S. at 584. In these circumstances, we have concluded that Carland and Lessees intended the agreements under consideration to be leases and that those agreements were in substance, as well as in form, leases.

Finally, respondent argues that no arm's-length relationship existed between Carland and Lessees and, therefore, the cases of *Lockhart Leasing Co.*, *Western Contracting Corp.*, *LTV Corp.*, and *Northwest Acceptance Corp.*, relied on by petitioners, are inapposite. We find respondent's position untenable and somewhat puzzling.

The test, as we perceive it, is the substance of the transaction as reflected, inter alia, in the parties' intent. If the relationship of the parties is to be viewed as a controlling factor, it would be very difficult, if not impossible, for related parties to enter into a valid lease arrangement in circumstances, even where they clearly intended, in form and substance, to effect a lease rather than a purchase. Such a tenet would raise havoc in situations that otherwise have all the elements of a normal commercial transaction, and it fails to recognize the realities of and the use of the corporate structure in the business world. The relationship between Carland and Lessees should not, by itself, cause us to conclude that those entities may not enter into valid lease agreements or that the rental payments are not deductible so long as those payments are reasonable. Cf. *Merritt v. Commissioner*, 39 T.C. 257, 272–273 (1962). In the circumstances of the

---

[26]In *Northwest Acceptance Corp. v. Commissioner*, 58 T.C. 836 (1972), affd. per curiam 500 F.2d 1222 (9th Cir. 1974), the sum of the contracts' periodic payments and option prices approximated the cost of the equipment under a deferred payment plan.

instant case, we believe that, while the factor of control cannot be totally ignored, its presence is not in and of itself determinative of whether the transactions at issue are leases or purchases.

In the alternative, respondent admits the existence of valid lease agreements between Carland and Lessees and argues that the rental deductions were either excessive or represented advance rent. Respondent, seeking to reduce what he regards as excessively large deductions in the initial years of the lease term, further contends that the proper annual deduction for a particular item of equipment should be determined by amortizing the total rentals paid for the piece of equipment over its guideline life.[27]

As a basis for his alternative contentions, respondent makes many of the same arguments (i.e., concerning tax motivation, the discrepancy in rental payments over the terms of the leases, the continued use of the equipment after the terms of the leases) which we have previously dealt with in deciding the lease-versus-purchase issue. We think that the rationale of our foregoing discussion also disposes of respondent's alternative contentions. However, one final observation concerning the relationship of the parties and the nature of the dealings between them is necessary.

The general rule governing the deductibility of rental payments between related parties to a valid lease is as follows:

> The basic question is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. * * * When there is a close relationship between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. * * * [*Place v. Commissioner*, 17 T.C. 199, 203 (1951), affd. 199 F.2d 373 (6th Cir. 1952), cert. denied 344 U.S. 927 (1953), quoted with approval, *Mackinac Island Carriage Tours, Inc. v. Commissioner*, 455 F.2d 98, 100 (6th Cir. 1972).]

---

[27]Respondent argues that the disallowance under each of his alternative theories is the same as that determined in his statutory notice of deficiency, where respondent treated the Carland leases as sales and allowed the total rentals paid to be amortized over the guideline lives of the equipment.

To be sure, a "close relationship" existed between petitioner and Carland[28] and, if we assume without deciding that these parties did not deal at arm's length, our attention must turn to the reasonableness of the rentals paid by Lessees to Carland over the period of the leases.

On this point, petitioner's expert witness testified that a lease which allowed the lessor to recover his total cost in the property subject to the lease plus receive some rate of return on his investment was not uncommon in the leasing industry during the years at issue; that the absence of a purchase option in such a lease was not uncommon; and that the informal practice of retaining the property at a minimal rental after the duration of the lease period was not uncommon. He concluded that the rates paid by Lessees to Carland during the primary term of the leases were equal to, and in many cases less than, the rates that Lessees would have had to pay if Lessees had entered into similar leases with parties other than Carland during the years at issue. We think this to be relevant and competent evidence, which respondent wholly failed to contradict. See *Foster v. Commissioner*, 391 F.2d 727, 735 (4th Cir. 1968). Respondent presented no evidence as to reasonable rental value, but instead chose to rely upon the proposition that the reasonable rental value should equal guideline life depreciation. In these circumstances, petitioner must prevail. See *American Metal Products Corp. v. Commissioner*, 34 T.C. 89, 105–106 (1960), affd. on another issue 287 F.2d 860 (8th Cir. 1961). In light of this uncontradicted testimony coupled with the foregoing reasoning on the lease-versus-purchase issue, we hold that the payments made by Lessees to Carland during the years at issue constituted reasonable rentals.

## Issue II. Darby Freight Cars

### FINDINGS OF FACT

During the taxable years in issue, Railway and L & A were engaged in operating rail freight and passenger service between Kansas City, Mo., and Port Arthur, Tex., and between Dallas,

---

[28]During the taxable years in question, Carland was a 75-percent-owned subsidiary of petitioner. The remaining 25 percent was owned by Marqua, a former employee of petitioner and Deramus' choice to be president of Carland.

Tex., and New Orleans, La. During the period 1962 to 1969, Railway and L & A had in service about 10,000 freight cars consisting of about 5,000 boxcars, 1,250 gondola cars, 1,250 open-top hoppers, 1,200 flatcars, and various other types of freight cars.

Beginning in 1962, Railway and L & A began a program to upgrade their fleet of rolling stock (freight cars). Their program for improvement essentially involved the overhaul by Darby Products of Steel Plate, Inc. (Darby), of 3,984 "bad order" freight cars to permit them to meet the Interchange Rules formulated by the Association of American Railroads (AAR). Darby was engaged both in the manufacture of new freight cars and in the rebuilding of freight cars to receive rebuilt recognition status[29] from the AAR. Rebuilt recognition status was sought by Railway and L & A and was accorded by the AAR to 3,400 freight cars of the 3,984 in the program.

The AAR is an association of railroads that represents the railroad industry before various Government agencies, governs operations, maintenance, safety, data processing, and public relations, and administers car service rules and car hire rules for and among its members. All railroads in the United States, Canada, and Mexico are eligible for membership, but membership is primarily made up of the larger railroads. All railroads having gross revenues of $5 million or more per year (class I railroads) are members of the AAR. During the taxable years ended December 31, 1962, to December 31, 1969, Railway and L & A were then, and at the time of trial, class I railroads and members of the AAR. During the years 1962 through 1969, the AAR published annually a "Code of Rules Governing the Condition of, and Repair To, Freight and Passenger Cars for the Interchange of Traffic," commonly known and hereinafter referred to as Interchange Rules. Interchange is the physical transfer of railroad cars from one railroad to another allowing the railroad cars to travel to their ultimate destination on the line of the receiving railroad. All railroad cars passing from one railroad to another (i.e., through interchange) must meet the structural and mechanical requirements set forth by the Interchange Rules. Railway and L & A, as members of the AAR, are

---

[29]See the subsequent discussion.

subject to the Interchange Rules and are thereby permitted to receive railroad cars from foreign railroads (any railroad other than Railway and L & A) for movement over Railway's or L & A's lines and also to deliver Railway's or L & A's railroad cars to a foreign railroad for movement on the foreign railroad's lines.

Car hire is the rent a railroad must pay to the car owner for the use of his car while it is on the carrying railroad. The amount of the car hire is based on the depreciated value of each car and is determined monthly by tariffs filed with the ICC and each of the various States in which the railroad operates. Railroad cars destroyed while on a foreign line are settled for between the car owner and foreign line in accordance with Interchange Rule 112. Settlement for a destroyed car is made on the basis of reproduction cost applicable at the time of destruction, less depreciation. To determine reproduction cost for the purpose of obtaining settlement value of rebuilt cars, cost of reproduction in kind at the date of destruction is obtained by adjusting the "rebuilt value" (value as restated in owner's equipment investment account in accordance with the accounting rules and requirements of the ICC in effect at the time of rebuilding) to date by the relation of costs as between those in the year rebuilt and in the year prior to date destroyed.

Rule 112, section E, of the AAR Interchange Rules contains definitions of new and rebuilt cars. A new car is defined as "an additional unit having a completely new car body and underframe." A new car is permitted by the rule to consist of certain described secondhand materials. A rebuilt car is defined as "an existing unit that has been recognized as rebuilt under sections F, G, and H of this rule." A freight car embodying secondhand details other than those permitted for new cars is treated as a rebuilt car under AAR Interchange Rule 112, section G(3).

The procedure for obtaining "rebuilt" recognition, as delineated by rule 112 of the Interchange Rules, involves submission to the AAR of AAR Rebuilt Forms A and C which describe the particular cars being submitted and the work performed thereon that upgrades, modernizes, and qualifies the rebuilt cars for rebuilt recognition. The accuracy of the AAR Rebuilt Forms A and C must be certified by both the chief mechanical officer and the chief accounting officer of the owner of the cars submitted. If the AAR, after consideration of the submission, finds that the rebuilt recognition requirements have been met, the AAR sends

a letter to the owner certifying the rebuilt recognition status of the cars submitted. The economic advantages inuring to a railroad when its cars receive rebuilt recognition are primarily twofold: (1) When a car having rebuilt recognition is destroyed on a foreign line, the depreciated value for which the foreign line is obligated to pay the owner takes into consideration the cost that went into the rebuilding of the car; and (2) since rebuilt recognition increases the depreciated value of a car, per diem or car hire for the car is higher.

During the taxable years ended December 31, 1962, to December 31, 1969, inclusive, Darby was engaged in the business of building and rebuilding railroad freight cars for Railway, L & A, and other railroads at its two rebuilding plants in Kansas City, Kans.

The Darby facilities for rebuilding freight cars consist of two work areas, the main plant and the shipyard. Most of the rebuilding of freight cars is done at the shipyard facility because it has a larger capacity than the main plant, but when necessary, to meet production demand, rebuilding is also done at the main plant. The physical layout of the shipyard consists of a series of tracks and switches that form a circle which allows cars to be moved in and out in a continuous fashion. The shipyard is able to accommodate, depending on the situation, from 30 to 60 cars at any one time.

In general, Darby's rebuilding process involved disassembling a freight car into its components, examining the components, discarding parts that were unusable or unrepairable and retaining parts that were reusable or restorable, replacing parts as necessary (including parts which served as improvements or met changed standards), and reassembling the components into a freight car (of a similar or different type).

All 3,984 freight cars in issue were rebuilt by Darby pursuant to plans, specifications, and blueprints prepared by the Darby engineering department in accordance with AAR requirements for rebuilt status; all plans and specifications were subject to the final approval, disapproval, or revision by Railway or L & A.

The Darby process for rebuilding boxcars and lengthened boxcars generally involved the following:

1. Interior stripping
2. Sandblasting
3. End straightening

4. Underframe rebuilding
5. Exterior rebuilding
6. Interior rebuilding and doors
7. Truck rebuilding:
    a. Disassembly
    b. Bolster, side frames, journals, and springs
    c. Brakes
    d. Miscellaneous
    e. Wheels and axles
    f. Reassembly
8. Airbrake system reconditioning
9. Exterior sandblasting
10. Painting and inspection

The Darby process for rebuilding open-top hopper cars generally involved items 2, 4, 7, 8, 9, and 10 above; and the following:

11. Superstructure dismantling
12. Superstructure rebuilding
13. Safety appliances

The Darby process for rebuilding bulkhead flatcars generally involved items 2, 4, 7, 8, 9, 10, 11, and 12 above.

The Darby process for rebuilding covered hopper cars generally involved items 2, 4, 7, 8, 9, 10, 12, and 13 above; and the following:

14. Roof dismantling
15. Interior rebuilding

The Darby process for rebuilding gondola cars generally involved items 2, 4, 7, 8, 9, 10, 11, 12, and 13 above; and the following:

16. Flooring

The Darby process for rebuilding woodchip hopper cars generally involved items 2, 4, 7, 8, 9, 10, 11, and 12 above. New car numbers were assigned upon completion of the Darby rebulding process.

During the years in controversy, the Darby freight car rebuilding process for the cars at issue was supervised by qualified Darby inspectors. During these years, Darby employed an average of three inspectors whose duty was to see that the plans, specifications, and blueprints as agreed to for each series of cars were carried out and that the work was done in a workmanlike manner. The Darby inspectors worked at both the

main plant and the shipyard and, on behalf of Darby, inspected each car that was being rebuilt. In addition to the plans, specifications, and blueprints, the Darby inspectors used the AAR Interchange Rules as part of their inspection criteria since these rules are the accepted and governing rules for rebuilding cars for all member railroads. Railway and L & A also had an employee at Darby whose duty was to inspect the rebuilt cars on behalf of Railway and L & A. The Railway and L & A inspectors stationed at Darby during the taxable years in issue inspected cars being rebuilt at both the main plant and the shipyard, and it was their duty to see that the plans, specifications, and blueprints as agreed to by Darby and Railway or L & A were fully carried out, that Railway's and L & A's best interests were protected, and that the work was performed by Darby employees in a workmanlike manner. Any required interpretations of the plans, specifications, and blueprints arising during the construction process were generally resolved by reference to the applicable AAR rules.

For purposes of considering the questions presented by this issue, the 3,984 cars are separated below into four groupings under the following headings: *"3,137 Freight Cars," "522 Freight Cars," "66 Freight Cars,"* and *"259 Freight Cars."* These 3,984 cars constitute tangible personal property subject to depreciation under section 167, or other tangible property subject to depreciation used as an integral part of furnishing transportation services. The useful life of each of the freight cars was 8 years or more.

Petitioner claimed accelerated depreciation (sec. 167(b)) on its pertinent Federal income tax returns for all of the cars at issue except those discussed below under the heading *"259 Freight Cars."* Respondent has disallowed these claims. (See note 28 *infra.*) Petitioner claimed the investment credit (sec. 38) on its pertinent Federal income tax returns for all of the cars at issue except those discussed below under the heading *"522 Freight Cars."*[30] Respondent has disallowed these claims as well.

---

[30] A claim for the investment credit for the 522 cars is made by petitioner in docket No. 974–72.

As to the depreciation claim for the 522 cars, the tax returns for 1963 through 1969 claimed deductions with respect to the total costs of these cars, determined under the 150-percent declining balance method and based on a 14-year useful life. In his statutory notice, respondent determined that the deduction with respect to $41,633.34 of the total cost should be determined

*3,137  Freight  Cars*

In the taxable year 1963, petitioner[31] transferred 67 freight cars to: Tamarack, Inc. (60), Comet Distributing Corp. (6), and Darby (1). (Ultimately all 67 cars were received by Darby.) In the listed years, petitioner transferred freight cars to Darby as follows:

| Year | Freight cars transferred to Darby |
|------|-----------------------------------|
| 1964 | 500 |
| 1965 | 703 |
| 1966 | 730 |
| 1967 | 675 |
| 1968–69 | 462 |

These 3,137 freight cars were of various types and all had been acquired by petitioner in prior years. The transfers described above were evidenced in most part by bills of sale from petitioner.

When the 3,137 freight cars were received by Darby, they underwent the appropriate Darby rebuilding process.[32] During 1963, petitioner received from Darby and placed into service 67 rebuilt freight cars. During 1964, petitioner received from Darby and placed into service 500 rebuilt freight cars. On or about January 15, 1964, Darby and petitioner entered into a conditional sales agreement relating to the financing of 497 of the 500 rebuilt freight cars which Darby assigned to Chemical Bank New York Trust Co., agent (hereinafter Chemical Bank). In 1965, petitioner received from Darby and placed into service, 703 rebuilt freight cars. On or about April 1, 1965, Darby and petitioner entered into a conditional sales agreement relating to financing of the cost of 685 of the 703 rebuilt freight cars which

---

under the straight line method and that the balance of $3,119,510.66 was properly depreciated under the 150-percent declining balance method. Petitioner now claims that the total costs of the group of 522 cars (along with the group of 3,137 cars and the group of 66 cars) should be depreciated under the double declining balance method.

[31]In our findings relating to the several subgroupings of freight cars, we use the term "petitioner" to refer to Railway and/or to L & A.

[32]E.g., a number of freight cars were rebuilt for special service for petitioner's customers as follows:

| Customer | Business | Special use |
|----------|----------|-------------|
| Dierks Lumber Co. | Building supplies | Plasterboard loading |
| General Mills, Inc. | Flour milling | Flour loading |
| Pet Milk Co. | Dairy products | Insulated boxcars |

Darby assigned to Chemical Bank. In 1966, petitioner received from Darby 730 rebuilt freight cars. On or about March 15, 1966, Darby and petitioner entered into a conditional sales agreement relating to the financing of the cost of the 730 rebuilt freight cars which Darby assigned to Chemical Bank. The 730 rebuilt freight cars were placed in service by petitioner during 1966. In 1967, petitioner received from Darby 675 rebuilt freight cars. On or about February 15, 1967, Darby and petitioner entered into a conditional sales agreement relating to the financing of the cost of 691 rebuilt freight cars, which group included the 675 rebuilt freight cars received from Darby and placed into service by petitioner in 1967. The conditional sales agreement was assigned by Darby to Chemical Bank on or about February 15, 1967. During the taxable years ended December 31, 1968, and December 31, 1969, petitioner received from Darby 462 rebuilt freight cars. On or about May 2, 1968, Darby and petitioner entered into a conditional sales agreement relating to the financing of the cost of the 462 rebuilt freight cars which Darby assigned to Chemical Bank. Petitioner placed in service in 1968, 360 of the 462 rebuilt freight cars, and 102, thereof, were placed in service by petitioner in 1969.

The total costs paid or incurred by petitioner during the taxable years in issue with respect to the 3,137 freight cars were as follows:

| Taxable year | Number of cars | Cost |
| --- | --- | --- |
| 1963 | 67 | $734,057.52 |
| 1964 | 500 | 5,084,148.25 |
| 1965 | 703 | 7,704,694.00 |
| 1966 | 730 | 8,650,000.00 |
| 1967 | 675 | 7,688,335.11 |
| 1968–69 | [33] 462 | 5,035,018.00 |
| Total | 3,137 | 34,896,252.88 |

During 1963 through 1969, petitioner requested and received rebuilt recognition status from the AAR on 3,117 of the 3,137 freight cars transferred to Darby. No such request was made of the AAR with respect to 20 of the 3,137 rebuilt freight cars. In the case of 2,645 of the 3,137 cars, the value of the reused parts

---

[33] By agreement of the parties, costs for 360 of these cars were paid or incurred in 1968, and costs for the remaining 102 cars were paid or incurred in 1969.

in each car, as reported to the AAR, exceeded 20 percent, and was as much as 66 percent, of the total value of all parts contained in the car. In the case of 472 of the 3,137 cars, the value of the reused parts in each car, as reported to the AAR, did not exceed 20 percent of the value of all parts contained in the car.[34]

### 522 Freight Cars

In 1962, petitioner sold to Darby Railway Cars, Inc. (DRC), 522 freight cars. DRC transferred the 522 freight cars to Darby where they underwent the rebuilding process described above. DRC, as lessor, and petitioner, as lessee, entered into a lease agreement on or about June 14, 1962, leasing the 522 rebuilt freight cars.[35] In 1963, petitioner purchased the 522 rebuilt freight cars from DRC. On or about August 1, 1963, DRC and petitioner entered into a conditional sales agreement relating to the financing of the cost of the 522 rebuilt freight cars which agreement was assigned by DRC to Continental Illinois Bank, agent, on or about August 1, 1963. The 522 rebuilt freight cars were placed in service by petitioner in 1963. The total cost of the 522 freight cars was $3,161,144.

### 66 Freight Cars

In 1962, petitioner sold to Tamarack, Inc., 66 freight cars, 49 were Clejan rack cars on the sale of which abnormal retirement losses were realized during the taxable periods ended October 31, 1962, and December 31, 1962, in the respective amounts of $59,591.86 and $26,460.45. Tamarack transferred the 66 freight cars to Darby where they underwent the rebuilding process described above.

In the period April 17, 1962, to March 13, 1963, Tamarack, as lessor, entered into certain lease agreements with petitioner leasing 49 rack cars and 17 boxcars—66 rebuilt freight cars in all.[36] In 1963, Tamarack sold to Chemical Bank as agent for certain investors (under a conditional sales agreement ·dated

---

[34]Respondent concedes that these 472 freight cars meet the "original use" test, discussed subsequently in our opinion.

[35]No election was made by DRC under sec. 48(d) to pass through the investment credit.

[36]No election was made by Tamarack under sec. 48(d) to pass through the investment credit.

October 1, 1956, as amended, between Pullman-Standard Car Manufacturing Co. and petitioner) 47 of the 49 rebuilt rack cars. In addition to this acquisition, petitioner purchased directly from Tamarack 2 of the 49 rebuilt rack cars. As a result of these transactions, petitioner acquired, in 1963, ownership of the 49 rebuilt cars, subject to the lien of the conditional sales agreement with respect to 47 rack cars, at a cost of $686,527. Petitioner purchased from Tamarack the remaining 17 rebuilt freight cars at a total cost of $186,390. The 66 rebuilt cars were placed in service by petitioner in 1963.

### 259 Freight Cars

In 1963, petitioner sold to Choctaw, Inc., 184 freight cars. Choctaw transferred the freight cars to Darby where they underwent the rebuilding process described above. In 1964, 1965, 1967, and 1969, petitioner transferred to Darby 13, 35, 9, and 18 freight cars, respectively, where they, too, underwent the same rebuilding process.

On or about July 15, 1963, Choctaw, as lessor, entered into an equipment lease with petitioner leasing 30 chip hopper cars, 75 open-top hopper cars, and 33 covered hopper cars, a total of 138 rebuilt freight cars. Choctaw elected to pass through to petitioner the investment credit relating to the 138 rebuilt freight cars costing $1,034,250. The 138 rebuilt freight cars were placed in service by petitioner on September 10, 1963. On or about December 19, 1963, Choctaw, as lessor, entered into an equipment lease with petitioner leasing 35 gondola cars and 11 covered hopper cars, a total of 46 rebuilt freight cars. Choctaw elected to pass through to petitioner the investment tax credit relating to the 46 rebuilt cars costing $520,675. The 46 rebuilt freight cars were placed in service by petitioner on December 27, 1963.

In 1964, Carland, Inc., purchased from Darby 13 rebuilt freight cars. On or about December 1, 1964, Carland, as lessor, entered into a lease with petitioner leasing four rebuilt boxcars. Carland elected to pass through to petitioner the investment tax credit relating to the four rebuilt boxcars costing $69,000. The four rebuilt boxcars were placed in service by petitioner on November 16, 1964. On or about June 16, 1964, Carland, as lessor, entered into a lease with petitioner leasing nine rebuilt boxcars. Carland elected to pass through the investment tax credit

relating to the nine rebuilt boxcars costing $99,135. The nine rebuilt boxcars were placed in service by petitioner on June 16, 1964.

During 1965, Carland purchased from Darby 35 rebuilt freight cars. On or about December 24, 1965, Carland, as lessor, entered into a lease with petitioner leasing 25 chip hopper cars and 10 boxcars, a total of 35 rebuilt freight cars. Carland elected to pass through to petitioner the investment tax credit relating to the 35 rebuilt freight cars costing $484,559. The 35 rebuilt freight cars were placed in service by petitioner on December 24, 1965.

In 1967, Carland purchased from Darby nine rebuilt boxcars. On or about March 1, 1967, Carland, as lessor, entered into a lease with petitioner leasing nine rebuilt boxcars. Carland elected to pass through to petitioner the investment tax credit relating to the nine rebuilt boxcars costing $168,318.54. The nine rebuilt boxcars were placed in service by petitioner on March 1, 1967.

In 1969, Carland purchased from Darby 18 rebuilt freight cars. On or about April 1, 1969, Carland, as lessor, entered into a lease with petitioner leasing 12 rebuilt outfit cars. Carland elected to pass through to petitioner the investment tax credit relating to the 12 rebuilt outfit cars costing $275,646. The 12 rebuilt outfit cars were placed in service by petitioner on April 1, 1969. On or about October 22, 1969, Carland, as lessor, entered into a lease with petitioner leasing four boxcars and two gondola cars. Carland elected to pass through to petitioner the investment tax credit on the six rebuilt freight cars costing $46,638.68. The six rebuilt freight cars were placed in service by petitioner on April 1, 1969.

### ULTIMATE FINDINGS OF FACT

*3,137 Freight cars.*—During 1963–69, 2,665 of petitioner's freight cars, which petitioner had acquired prior to the years at issue, were "reconstructed" (rebuilt) according to petitioner's plans and specifications.

*522 Freight cars.*—During 1962, petitioner leased from Darby Railway Cars, Inc., 522 "reconstructed" (rebuilt) freight cars, and during 1963, petitioner acquired those cars by purchase.

*66 Freight cars.*—During 1962 and 1963, petitioner leased from Tamarack, Inc., 66 "reconstructed" (rebuilt) freight cars, and, during 1963, petitioner acquired those cars by purchase.

*259 Freight cars.*—During 1963, petitioner leased from Choctaw, Inc., 184 "reconstructed" (rebuilt) freight cars, and, during 1964–69, petitioner leased from Carland, Inc., 75 "reconstructed" (rebuilt) freight cars.

## *Issue II. Darby Freight Cars.*

### OPINION

The issue here is whether the total costs of certain rolling stock (freight cars) qualify for the section 38 investment credit in light of the definition of "new section 38 property" provided in section 48(b) and qualify for section 167 accelerated depreciation in light of the requirements set forth in section 167(c).

Section 48(b) and 167(c) contain similar wording. Section 48(b) provides:

SEC. 48(b). NEW SECTION 38 PROPERTY.—For purposes of this subpart, the term "new section 38 property" means section 38 property—

(1) the construction, reconstruction, or erection of which is completed by the taxpayer after December 31, 1961, or

(2) acquired after December 31, 1961, if the original use of such property commences with the taxpayer and commences after such date.

In applying section 46(c)(1)(A) in the case of property described in paragraph (1), there shall be taken into account only that portion of the basis which is properly attributable to construction, reconstruction, or erection after December 31, 1961.

And section 167(c) provides:

SEC. 167(c). LIMITATIONS ON USE OF CERTAIN METHODS AND RATES.—Paragraphs (2), (3), and (4) of subsection (b) shall apply only in the case of property (other than intangible property) described in subsection (a) with a useful life of 3 years or more—

(1) the construction, reconstruction, or erection of which is completed after December 31, 1953, and then only to that portion of the basis which is properly attributable to such construction, reconstruction, or erection after December 31, 1953, or

(2) acquired after December 31, 1953, if the original use of such property commences with the taxpayer and commences after such date.

A total of 3,984 freight cars are involved in this issue. In order to address conveniently the questions presented, our discussion below divides these 3,984 cars into several groups.

## *3,137 Freight Cars*

During the years 1963 through 1969, Railway[37] transferred 3,137 freight cars to Darby Products of Steel Plate Corp. (Darby). Darby rebuilt the rolling stock in accordance with mutually agreed upon specifications and transferred all 3,137 cars back to Railway. On its Federal income tax returns for 1963 to 1969, inclusive, petitioner treated the transactions as sales to Darby. On repurchase of the cars, Railway claimed investment credit and accelerated depreciation on the entire purchase price.

Respondent disallowed the credit and accelerated depreciation with respect to that part of the purchase price equal to Railway's adjusted basis in the cars at the time of the transfer to Darby, but allowed the credit and accelerated depreciation with respect to the remainder of the purchase price.

Respondent argues that these cars were not "acquired" by Railway within the meaning of sections 48(b)(2) and 167(c)(2). Rather, he claims the cars were reconstructed and, as such, are within the contemplation of sections 48(b)(1) and 167(c)(1). As a result, respondent contends there is no basis for treating the *entire* repurchase price as subject to the investment credit and accelerated depreciation; under sections 48(b)(1) and 167(c)(1), Railway's adjusted basis in the reconstructed freight cars (before the sale to Darby) would be excluded from those benefits.[38]

It is respondent's position that the 3,137 freight cars were not "acquired" by Railway during the years at issue but were merely rebuilt during that period. We believe respondent is correct.

It is clear from the evidence of record that, during the years in question, Railway embarked on a major rebuilding program to

---

[37]As can be seen from our findings of fact, both Railway and L & A transferred freight cars and received reconstructed freight cars. However, to facilitate our discussion of issue II, we will refer simply to Railway in our opinion, as representative of both railroads.

[38]In an amended answer filed in docket Nos. 974–72 and 4788–73, respondent claims that if it should be determined that petitioner *did* acquire the cars within the meaning of secs. 48(b)(2) and 167(c)(2), then *no part* of the purchase price for 2,665 cars qualifies for the investment credit and accelerated depreciation. Respondent, accordingly, asserts increased deficiencies totaling $2,114,043. Respondent's position in this respect is premised on the fact that 2,665 cars "constitute rebuilt rolling stock" and therefore Railway fails "to qualify as the original user thereof" under the cited Code sections. In view of our conclusion herein that the 3,137 cars were not "acquired," as that term is used in secs. 48(b)(2) and 167(c)(2), we do not reach the alternative contention made by respondent in his amended answer, and his claim for an increased deficiency is therefore denied.

modernize its inventory of rolling stock and that Railway contracted with Darby to accomplish this objective. During the years at issue, Railway transferred the 3,137 freight cars to Darby through purported bills of sale. After rebuilding the cars to Railway's prearranged specifications, Darby returned them to Railway, also in purported sales transactions. When viewed from the perspective of economic reality, these alleged sales to Darby and repurchases lack economic substance. See *Commissioner v. Brown*, 380 U.S. 563 (1965); *Helvering v. Lazarus & Co.*, 308 U.S. 252 (1939); *Kraut v. Commissioner*, 62 T.C. 420 (1974), affd. 527 F.2d 1014 (2d Cir. 1975), cert. denied 425 U.S. 973 (1976). Railway was simply engaged in a major refurbishing of its freight car fleet. It was not engaged in a plan to divest itself of rolling stock and to acquire replacement rolling stock. On the contrary, Railway wanted to modernize its freight cars and to employ Darby in the process. Petitioner has failed to establish a business purpose for casting the transactions involving Railway and Darby in the form of a sale except to attempt to secure a step-up in tax basis.

Under these circumstances, we must hold that when Darby transferred the freight cars back to Railway during the years at issue, those cars were not being "acquired" by Railway for purposes of sections 48(b)(2) and 167(c)(2). The cars had been reconstructed by Railway and the limitations of sections 48(b)(1) and 167(c)(1) are applicable. Petitioner cannot be permitted the benefits of the investment credit and accelerated depreciation based solely on the form in which the modernization project was cast.

Petitioner makes the alternative argument that, even if sections 48(b)(2) and 167(c)(2) are inapplicable, petitioner is nonetheless entitled to investment credit and accelerated depreciation on Railway's *total* expenditure (i.e., the total amount paid to Darby to "purchase" the cars) under the provisions of sections 48(b)(1) and 167(c)(1). Petitioner premises this alternative argument on its view that the "construction * * * or erection" of the cars was completed after the dates specified in those sections and that the entire purchase price was paid for the construction or erection of the cars. Respondent, seeking to limit the benefits of those sections to only a part of the costs at issue, takes the position that the cars had been reconstructed and that only the cost of reconstruction (exclusive of petitioner's adjusted basis in

the freight cars) qualified for purposes of section 48(b)(1) and 167(c)(1).[39]

We agree with respondent that the freight cars were reconstructed rather than constructed (or erected). We believe Congress intended that the term "reconstruction" be given its commonly accepted meaning. Cf. H. Rept. 1447, *supra*, 1962–3 C.B. at 516.[40] In the context of the statute, "construction" and "erection" are synonymous with each other, but not with "reconstruction." A "reconstructed" freight car is the same as a "rebuilt" or "reconditioned" freight car. Cf. sec. 1.167(c)–1(b)(1), Income Tax Regs.

The Association of American Railroads (AAR) defines a "new" car as "an additional unit having a completely new car body and underframe" which could also have certain specified "secondhand material provided it meets with requirements for new cars per Rule 3." A rebuilt car is defined as "an existing unit that has been recognized as rebuilt under the provisions of" certain sections of the AAR Interchange Rules.[41] All but a few freight cars involved here have received rebuilt recognition under the AAR Interchange Rules. Consequently, by industry standards and practice, these rebuilt freight cars are not new. In fact, in one of the forms required by the AAR in an application of rebuilt recognition status there is the following question: "6. Was the dismantled car written out of your capital account and the *reconstructed car* accounted for as an added unit?"[42] (Emphasis supplied.) The answer to this question supplied by petitioner was: "Cars were written out of the Capital Account and the reconstructed car accounted for as an added unit."

---

[39]The parties are agreed that if it is held that the freight cars were *re*constructed, Railway's adjusted basis in the cars at the time reconstruction was commenced would not be subject to the investment credit or to accelerated depreciation. This is the result called for by the regulations. See sec. 1.48–2(b)(2), Income Tax Regs. Cf. sec. 1.167(c)–1(a)(1), Income Tax Regs.; H. Rept. 1337, 83d Cong., 2d Sess. A49. While the regulations under sec. 48 are clearer on this point than those under sec. 167, the two similarly worded Code sections are intended to be applied in a consistent manner (see H. Rept. 1447, 1962–3 C.B. 402, 519), and the exclusion of preconstruction adjusted basis from the benefits of both Code sections is appropriately reflective of congressional purpose. See further in this regard the subsequent discussion entitled "*522 Freight Cars.*"

[40]In common usage, the definition of "reconstruct" is "to construct again; rebuild; make over." The Random House College Dictionary (Random House, Inc. 1973).

[41]Rule 112, sec. E, Association of American Railroads, Interchange Rules (1969).

[42]Association of American Railroads, Mechanical Division AAR Record of Rebuilt Car, Form C.

After a careful consideration of the evidence bearing on this question, it is our conclusion that the freight cars at issue were "reconstructed" by Railway. In our view, the process of disassembling the various components of a freight car, the examination and discarding of unusable or unrepairable parts and their replacement with new or restored parts (including such parts which serve as an improvement or which meet changed standards), and the reassembling of those parts into a freight car (of the same or different type), i.e, the work which Darby performed, are all part of the "reconstruction" activity contemplated by sections 48(b)(1) and 167(c)(1).[43]

In light of this conclusion and respondent's position with respect to these 3,137 cars, we need not discuss at this point the requirement that the reconstruction work be completed "by the taxpayer." See sec. 48(b)(1); secs. 1.48–2(a)(1), 1.167(c)–1(a)(1), Income Tax Regs.

Accordingly, we conclude that these 3,137 cars are entitled to the investment credit and to accelerated depreciation to the extent allowed by respondent.

### 522 Freight Cars

In 1962, Railway sold 522 cars to Darby Railway Cars, Inc. (DRC), which in turn transferred them to Darby for rebuilding. In 1962, Railway leased the 522 cars from DRC and, in 1963, Railway acquired the cars by purchase from DRC. As with the other freight cars at issue herein, petitioner claims the total purchase price is within the purview of sections 48(b)[44] and 167(c).

Respondent does not dispute that Railway sold these cars to

---

[43] We recognize, of course, that the amount of new material or parts may be so substantial that the car could well be essentially equivalent to a new freight car. Respondent has conceded that 472 of the 3,137 cars fall into this latter category. (This concession limits the instant controversy to 2,665 cars.)

We note that rebuilt freight cars had to meet the requirements of the Association of American Railroads if they were to be used in interchange or if they were to be accorded rebuilt recognition status. However, the cars did not need to meet those requirements if they were not used in interchange. Further, we note that not all the rebuilt freight cars received rebuilt recognition status.

[44] The claim for the sec. 38 investment credit for these 522 cars is made herein by petitioner in docket No. 974–72. No such claim was made by petitioner on its tax returns.

DRC and "acquired" them from DRC in 1963 within the meaning of sections 48(b)(2) and 167(c)(2).[45] However, respondent takes the position that Railway was not the original user of these cars as required by those two sections and hence Railway does not qualify for the investment credit or accelerated depreciation with respect to any part of the repurchase price. Respondent argues that the "original use" of these cars commenced with DRC as lessor and not with Railway. Additionally, he argues that, since DRC did not elect to pass through the investment credit pursuant to section 48(d), Railway is not entitled to the investment credit under that provision. (We consider the section 48(d) passthrough in the discussion below entitled *"259 Freight Cars."*) Also, respondent argues that Railway fails to qualify as the original user after the critical dates of the 522 cars because they were "rebuilt" property within the meaning of section 1.48–2(b)(7), Income Tax Regs. See also sec. 1.167(c)–1(a)(2), Income Tax Regs.

Both sections 48(b)(2) and 167(c)(2) contain a requirement that the "original use" of the subject property must "[commence] with the taxpayer" after the relevant effective dates. "Original use" is discussed in both the House and Senate committee reports on H.R. 8300. The term relates to "property * * * new in use, that is, never before having been subject to depreciation whether or not depreciation deductions relating to such property were allowable." H. Rept. 1337, 83d Cong., 2d Sess. A49; S. Rept. 1622, 83d Cong., 2d Sess. 203. The principles applicable under section 167(c)(2) are to be applied under section 48(b)(2) in determining whether the property is "acquired" by the taxpayer and whether the "original use" of the property commences with the taxpayer. H. Rept. 1447, 87th Cong., 2d Sess., 1962–3 C.B. 402, 519; S. Rept. 1881, 87th Cong., 2d Sess., 1962–3 C.B. 703, 862.

The regulations provide that "The term 'original use' means the first use to which the property is put, whether or not such use corresponds to the use of such property by the taxpayer." Secs. 1.167(c)–1(a)(2), 1.48–2(b)(7), Income Tax Regs. Given this definition, we are unable to conclude that Railway was the

---

[45] We gather from respondent's opening brief that he does not deny that the 522 freight cars currently under discussion (and the 66 freight cars discussed subsequently) were "acquired." We proceed on that basis, although we note what seems to be a departure from that premise in respondent's reply brief. To the extent respondent has altered his position on reply brief to petitioner's disadvantage, we will not consider his contentions.

original user of the 522 freight cars. It is clear that DRC was the original user.

For purposes of section 48(b)(2), the fact that Railway initially leased the cars from DRC is significant. In *Haddock v. Commissioner*, 70 T.C. 511 (1978), the taxpayer leased certain equipment which he subsequently purchased from his lessors. Although no election under section 48(d) was made by any of the lessors to treat the taxpayer as having acquired the equipment when it was leased, the taxpayer claimed investment credits for the years in which he purchased the equipment. We denied the taxpayer's claim because, in the absence of an election, the "original use" of the leased property commenced with the lessor which had used the equipment in its leasing operation. See 70 T.C. at 514.[46]

We see no meaningful distinction between the facts of the *Haddock* case and the facts of the case at bar.[47] We must therefore agree with respondent that Railway, as lessee, does not satisfy the "original use" requirement. While *Haddock* has specific reference to section 48(b)(2), the case has obvious application to section 167(c)(2), given the similar language of the two provisions.

Support for respondent's contentions is also found in section 1.48–2(b)(7), Income Tax Regs., which provides that "a reconditioned or rebuilt machine acquired by the taxpayer will not be treated as being put to original use by the taxpayer." Similarly, section 1.167(c)–1(a)(2), Income Tax Regs., provides that "a reconditioned or rebuilt machine acquired after December 31, 1953, will not be treated as being put to original use by the taxpayer even though it is put to a different use." For the reasons similar to those set forth in the portion of this opinion entitled *"3,137 Freight Cars,"* we agree with respondent that the

---

[46]Once an election is made, the fact that the lessor used the property in a leasing operation is not critical, and the lessee is "considered the original user if he is the first person to use the property for its intended function." Sec. 1.48–4(b), Income Tax Regs.

[47]Petitioner does not deny that an election under sec. 48(d) was not made. We gather that petitioner is of the view that we should base our analysis of "original use" on the facts existing at the time of the purchases rather than at the time of the prior leases. To adopt this approach would necessitate our ignoring the facts existing prior to the purchases or would require us to conclude that Railway's "original use" commenced prior to its acquisition. Petitioner's approach is plainly at odds with the position adopted in *Haddock v. Commissioner*, 70 T.C. 511 (1978).

522 freight cars currently under discussion were "rebuilt," as that term is used in sections 1.48–2(b)(7) and 1.167(c)–1(a)(2), Income Tax Regs.

We do not believe these 522 "reconstructed" (rebuilt) cars fall within the purview of sections 48(b)(1) and 167(c)(1). In view of the intervening corporate entities and the manner in which the transactions were structured, the facts relating to these 522 cars differ sufficiently from those relating to the group of 3,137 cars to warrant a different result. In our view, the 522 cars cannot be viewed as having been "constructed, reconstructed, or erected by the taxpayer," as that term is used in sections 1.167(c)–1(a)(2) and 1.48–2(a) and (b), Income Tax Regs.[48]

We recognize that the requirement that the reconstruction work be completed "by the taxpayer" does not necessitate a showing that the work was actually performed by the taxpayer. Rather, it need only be shown that the taxpayer exercised the requisite degree of control and supervision over the details of reconstruction relating to the manner and means of performing the work. *Public Service Co. of New Mexico v. United States*, 431 F.2d 980 (10th Cir. 1970). See *Lykes Bros. Steamship Co. v. United States*, 206 Ct. Cl. 354, 513 F.2d 1342 (1975); *Pacific Far East Line, Inc. v. United States*, 206 Ct. Cl. 378, 513 F.2d 1355 (1975). See also sections 1.167(c)–1(a)(1) and 1.48–2(b)(1), Income Tax Regs., which provide that "Property is considered as * * * reconstructed * * * by the taxpayer if the work is done for him in accordance with his specifications." But these interpretations apply where the taxpayer contracts with someone else to do the work for the taxpayer. We do not believe they are applicable to the circumstances presently before us. The 522 freight cars under discussion were sold to a second party which contracted to have the reconstruction work done by a third party and then leased the reconstructed cars to Railway. Under such circumstances, we do not believe the reconstruction work can be considered as having been completed "by the taxpayer" within

---

[48]Respondent has broad authority to effect the purpose of the statute by promulgating regulations. *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496 (1948). Where, as with the accelerated depreciation and investment credit provisions, Congress has specifically given respondent authority to prescribe regulations to carry out the statute's purpose (see secs. 48(b) and 167(b)), respondent's regulations are entitled to a heavy presumption of validity. *Fawcus Machine Co. v. United States*, 282 U.S. 375 (1931). See also *Catron v. Commissioner*, 50 T.C. 306, 309 (1968).

the meaning of section 48(b)(1) and the cited regulations. If these cars are to qualify for the investment credit and accelerated depreciation, they must do so under sections 48(b)(2) and 167(c)(2).

Accordingly, petitioner is not entitled to the investment credit and accelerated depreciation for these 522 freight cars.

## 66 Freight Cars

In 1962, Railway sold 66 freight cars to Tamarack which in turn transferred them to Darby for rebuilding. In 1962 and 1963, Railway leased the 66 cars from Tamarack, and, in 1963, Railway acquired the cars by purchase from Tamarack. Here, also, petitioner claims the total purchase price is within the purview of sections 48(b) and 167(c). Respondent's position with respect to these 66 cars is identical to that described above in our discussion of the 522 cars. The facts relating to the 522 cars and these 66 cars are quite similar. For the reasons given above in our discussion entitled "*522 Freight Cars*," we conclude that petitioner is not entitled to the investment credit and accelerated depreciation for these cars.

## 259 Freight Cars

In 1963, Railway sold 184 cars to Choctaw, which in turn transferred them to Darby for rebuilding. In 1964, 1965, 1967, and 1969, Railway sold a total of 75 cars to Carland, which in turn transferred them to Darby for rebuilding. Railway leased the 184 rebuilt cars from Choctaw in 1963 and leased the 75 rebuilt cars from Carland during 1964–69. As to these 259 cars, petitioner's claim herein is limited to the section 48 investment credit. Both Choctaw and Carland elected to pass the credit through to Railway pursuant to section 48(d). Respondent's position is that the pass through election for these cars was not proper on the facts of this case.

Section 48(d) provides in part:

(1) GENERAL RULE.—A person * * * who is a lessor of property may (at such time, in such manner, and subject to such conditions as are provided by regulations prescribed by the Secretary) elect with respect to any new section 38 property * * * to treat the lessee as having acquired such property * * *

The pertinent regulations mirror the statutory requirement that the property subject to the election must be "new section 38

property." Sec. 1.48–4(a)(1)(ii) and (iii), Income Tax Regs. The last-cited regulatory provision states that the following conditions must be satisfied in order for there to be a valid passthrough election:

(iii) The property would constitute "new section 38 property" to the lessee if such lessee had actually purchased the property. Thus, the election is not available if the lessee is not the original user of the property. See paragraph (b) of this section for the application of the rules relating to "original use" in the case of leased property. * * *

Section 1.48–4(b), Income Tax Regs., provides in part:

The determination of whether the lessee qualifies as the original user of leased property shall be made, under paragraph (b)(7) of sec. 1.48–2, as if the lessee actually purchased the property. Thus, the lessee would not be considered the original user of the property if it has been previously used by the lessor or another person, or if it is reconstructed, rebuilt, or reconditioned property. However, the lessee would be considered the original user if he is the first person to use the property for its intended function. Thus, the fact that the lessor may have, for example, tested, stored, or attempted to lease the property to other persons will not preclude the lessee from being considered the original user.

Respondent argues that the "original use" of the leased 259 cars did not commence with Railway after the relevant date because they were rebuilt by Darby prior to being leased to Railway.[49] Thus, the "original use" test was not met, according to respondent, and the cars were not "new section 38 property." As a result, respondent concludes that the elections made by Choctaw and Carland to pass through the investment credit were not valid.

For reasons similar to those given above in our discussion entitled *"3,137 Freight Cars,"* we agree with respondent that the 259 cars at issue were "reconstructed, rebuilt, or reconditioned property," as that term is used in section 1.48–4(b), Income Tax Regs. See also sec. 1.48–2(b)(7), Income Tax Regs. See and compare the discussion above entitled *"522 Freight Cars."* Since

[49]In the statutory notices of deficiency issued in docket Nos. 974–72 and 4788–73, respondent disallowed the investment credit on the 75 cars leased from Carland on the basis that the transactions were in reality not leases but conditional sales. Respondent's primary position as to these cars is that, although they were purchased by Railway after Dec. 31, 1961, the cars were rebuilt, and Railway can therefore not qualify as the original user under sec. 1.48–2(b)(7), Income Tax Regs. In our view, the transaction at issue did constitute valid leases, and we have so held. See Issue I. *Carland Rentals.* As a consequence, our discussion above gives consideration only to respondent's alternative contention regarding these 75 cars.

the 259 freight cars were "reconstructed" or "rebuilt" Railway cannot qualify as the original user under the above-cited regulatory provisions.[50] Accordingly, the 259 cars were not "new section 38 property" (see sec. 1.48–4(a)(1)(iii), Income Tax Regs.), and no investment credit with respect to those cars could properly be passed through to Railway under section 48(d).[51]

## Issue III. Relay Rail

### FINDINGS OF FACT

Throughout the years at issue, petitioner, as the rail in its tracks became worn, replaced such worn rail with either new or better used track. The replaced track, depending on the extent of the wear, was either sold as scrap or was relaid somewhere else as additional or better track or was placed in inventory to be used for such purpose at a later date. Under the retirement-replacement-betterment (RRB) method of accounting used by petitioner, the value assigned to the rail that is picked up but is to be used again elsewhere in the system (relay rail) enters into the computation of the charge made to the operating expense account and thus has an impact on taxable income. The higher the value assigned to the relay rail the lower the deduction will be, and an increase in taxable income results.

Railway and L & A were required to maintain and did maintain their accounts relating to rail under the Interstate Commerce Commission (ICC) Uniform System of Accounts for Railroad Companies during all the taxable years in issue. During the taxable years 1962 to 1969, Railway and L & A used the RRB method of accounting for Federal income tax and ICC purposes

---

[50]We note that the sentence in sec. 1.48–4(b) of the regulations, to the effect that the lessee cannot be considered the original user of rebuilt property, is followed by the sentence "However, the lessee would be considered the original user if he is the first person to use the property for its intended function." It can be argued that the latter sentence is a limitation on the preceding sentence and since Railway was the first to use the rebuilt cars for their intended use, the fact that the cars were rebuilt does not automatically disqualify Railway as the original user. On the other hand, the "However" sentence quoted above might just as well be intended to point out that in the credit passthrough election situation the use by the lessor in its leasing business does not preclude the lessee from being considered the "original user" as in *Haddock v. Commissioner, supra.* In light of the fact that the "rebuilt" language is similarly used in other sections of the regulations (secs. 1.48–2(b)(7), 1.167(c)–1(a)(2), Income Tax Regs.), we do not believe the first argument is meritorious.

[51]See *Hutton v. Commissioner*, T.C. Memo. 1976–6.

for determining the amounts of allowable deductions with respect to property in track accounts.[52]

"Relay rail" is rail which has been removed (released) from the tracks but which has additional service life remaining; it must be reasonably straight and free of major defects and may contain only minor defects.

"Scrap rail" is rail which has been removed (released) from the tracks with no additional service life remaining, and consists of broken rail, defective rail, short rail, or other rail not suitable for relay.

When a planned relay, i.e., one involving a tangent stretch of track a mile or more in length or the length of a curve, occurred on Railway or L & A during the taxable years in issue, the accounting department was advised by the road foreman of the pattern weight and linear feet of the rail released. From this information, the accounting department determined mathematically the number of tons of rail involved in the relay and made appropriate accounting entries.

The dollar amounts assigned by Railway and L & A to rail released from the track structure and placed in inventory during the taxable years in issue depended upon whether the released rail was to be scrapped or relaid. During all the taxable years here in issue, Railway and L & A used approximately $20-per-net-ton pattern weight for scrap rail and approximately $30-per-net-ton pattern weight for relay rail. Prior to 1957, the amounts in use were approximately $12.50- and $20-per-net-ton pattern weight for scrap rail and relay rail, respectively.

During the taxable years here in issue, Railway and L & A released and relaid (picked up and reused) and charged to track accounts as additions and betterments the following tons of relay rail:

| | Tons of relay rail | |
| Year/period ended | Railway | L & A |
|---|---|---|
| Oct. 31, 1962 | 420.21 | 535.225 |
| Dec. 31, 1962 | 84.04 | 107.045 |
| Dec. 31, 1963 | 3,503.00 | 661.2967 |
| Dec. 31, 1964 | 1,412.10 | 983.707 |

---

[52]The operation of the retirement-replacement-betterment method of accounting in a relay rail context is discussed in the various cases, cited in our opinion, which present this issue.

| | | |
|---|---:|---:|
| Dec. 31, 1965 | 1,292.00 | 678.00 |
| Dec. 31, 1966 | 351.00 | 413.00 |
| Dec. 31, 1967 | 1,703.00 | 1,679.00 |
| Dec. 31, 1968 | 822.50 | 1,027.50 |
| Dec. 31, 1969 | [1]497.50 | |

[1] Combined amount for Railway and L & A.

During these taxable years, Railway and L & A, pursuant to the accounting practices described above, used the following values for Federal income tax, ICC, and financial accounting purposes for relay rail released and relaid and charged to track accounts as additions and betterments:

| | Railway | | L & A | |
|---|---:|---:|---:|---:|
| | | Value | | Value |
| Year/period ended | Value | per ton | Value | per ton |
| Oct. 31, 1962 | $12,547 | $29.87 | $15,600 | $29.87 |
| Dec. 31, 1962 | 2,509 | 29.87 | 3,119 | 29.87 |
| Dec. 31, 1963 | 97,243 | 28.22 | 19,823 | 28.22 |
| Dec. 31, 1964 | 44,078 | 30.65 | 30,561 | 30.65 |
| Dec. 31, 1965 | 40,072 | 31.02 | 20,348 | 30.03 |
| Dec. 31, 1966 | 13,595 | 38.73 | 19,448 | 47.09 |
| Dec. 31, 1967 | 52,022 | 30.55 | 50,419 | 30.03 |
| Dec. 31, 1968 | 25,019 | 30.42 | 30,844 | 30.03 |
| Dec. 31, 1969 | [1]15,165 | [1]30.48 | | |

[1] Combined figures for Railway and L & A.

Respondent assigned the following amounts as representing the fair market values (per ton) of Railway's and L & A's rail as new:

| | Fair market value new | |
|---|---:|---:|
| Year ended Dec. 31— | Railway | L & A |
| 1962 | $121.25 | $125.18 |
| 1963 | 126.32 | 126.75 |
| 1964 | 130.75 | 125.84 |
| 1965 | 144.71 | 143.92 |
| 1966 | 145.27 | 138.33 |
| 1967 | 133.72 | 127.71 |
| 1968 | 146.43 | 130.31 |
| 1969 | 146.55 | 146.55 |

Respondent assigned the following value to relay rail released and relaid and charged to track accounts as additions and betterments:

| | Railway | | L & A | |
|---|---|---|---|---|
| | | Value | | Value |
| Year/period ended | Value | per ton | Value | per ton |
| Oct. 31, 1962 | $31,835 | $75.7595 | $38,715 | $72.4134 |
| Dec. 31, 1962 | 6,367 | 75.7595 | 7,787 | 72.4134 |
| Dec. 31, 1963 | 257,422 | 73.4861 | 48,405 | 73.1975 |
| Dec. 31, 1964 | 105,657 | 74.8225 | 71,554 | 72.739 |
| Dec. 31, 1965 | 105,487 | 81.6255 | 55,422 | 81.78 |
| Dec. 31, 1966 | 29,923 | 85.2509 | 32,697 | 79.17 |
| Dec. 31, 1967 | 123,428 | 72.4762 | 124,003 | 73.855 |
| Dec. 31, 1968 | 70,453 | 85.6577 | 82,363 | 80.1587 |
| Dec. 31, 1969 | [1]42,615 | [1]85.6577 | | |

[1] Combined figures for Railway and L & A.

In determining the net adjustments to taxable income for the taxable years in issue arising out of the increases in value assigned to relay rail, respondent amortized said increases over a 20-year period on a straight line basis and reduced the gross adjustments to taxable income relating to relay rail by the amount of such amortization, beginning with the taxable year immediately following the taxable year with respect to which each such adjustment was made.

The values assigned to relay rail by respondent and the determined amortization of such adjustments as set forth above resulted in the following adjustments to the taxable income of Railway for each of the taxable years in issue.

| Year/period ended | Increases in taxable income | Amortization allowed | Net adjustment to taxable income |
|---|---|---|---|
| Oct. 31, 1962 | $19,288.33 | 0 | $19,288.33 |
| Dec. 31, 1962 | 3,857.67 | 0 | 3,857.67 |
| Dec. 31, 1963 | 160,179.00 | $1,161.00 | 159,018.00 |
| Dec. 31, 1964 | 40,993.00 | 2,817.90 | 38,175.10 |
| Dec. 31, 1965 | 65,410.00 | 12,251.19 | 53,158.81 |
| Dec. 31, 1966 | 16,328.07 | 15,514.00 | 814.07 |
| Dec. 31, 1967 | 71,406.00 | 16,330.40 | 55,075.60 |
| Dec. 31, 1968 | 45,434.00 | 19,900.70 | 25,533.30 |
| Dec. 31, 1969 | 13,725.00 | 22,172.40 | (8,447.40) |

The values assigned to relay rail by respondent and the determined amortization of such adjustments as set forth above resulted in the following adjustments to the taxable income of Railway for each of the taxable years in issue.

| Year/period ended | Increases in taxable income | Amortization allowed | Net adjustment to taxable income |
|---|---|---|---|
| Oct. 31, 1962 | $23,152.50 | 0 | $23,152.50 |
| Dec. 31, 1962 | 4,630.50 | 0 | 4,630.50 |
| Dec. 31, 1963 | 28,582.00 | $1,394.00 | 27,188.00 |
| Dec. 31, 1964 | 40,993.00 | 2,817.90 | 38,175.10 |
| Dec. 31, 1965 | 35,074.00 | 4,871.81 | 30,202.19 |
| Dec. 31, 1966 | 13,249.21 | 6,622.00 | 6,627.21 |
| Dec. 31, 1967 | 73,583.86 | 7,284.46 | 66,299.40 |
| Dec. 31, 1968 | 51,519.00 | 10,963.66 | 40,555.34 |
| Dec. 31, 1969 | 13,725.00 | 13,539.61 | 185.39 |

Construction of the Railway line commenced in Jackson County, Mo., in 1866. The line was completed to Port Arthur, Tex., by 1897. Ownership of Railway was substantially the same throughout this period, resulting in a track structure with substantially homogeneous engineering characteristics.

Construction of the L & A line commenced at Stamps, Ark., in 1896. L & A subsequently acquired a number of other lines, including the Louisiana Railway & Navigation Co., and the Louisiana Railway & Navigation Co. of Texas. The accumulation of the various lines resulted in a track structure with diversified engineering characteristics.

The net change between December 31, 1962, and December 31, 1968, in all classes[53] of track operated by Railway was 14.86 miles determined as follows:

| | Balance Dec. 31, 1962 | Balance Dec. 31, 1968 | Net change |
|---|---|---|---|
| Class 1 | 1,478.03 | 1,473.45 | –4.58 |
| Class 3 | 8.63 | 2.23 | –6.40 |
| Class 5 | 56.89 | 53.01 | –3.88 |
| | 1,543.55 | 1,528.69 | –14.86 |

The net change between December 31, 1962, and December 31, 1968, in all classes of track operated by L & A was 2.93 miles determined as follows:

[53]Class 1 includes lines to which a railroad has title in perpetuity. Class 3 includes lines operated under a lease, with a specific and unconditional rent reserved. Class 5 includes lines operated and maintained by others, over which the railroad operates as a licensee.

|         | Balance<br>Dec. 31, 1962 | Balance<br>Dec. 31, 1968 | Net<br>change |
|---------|-------------------------|-------------------------|---------------|
| Class 1 | 893.79                  | 890.41                  | −3.38         |
| Class 3 | 2.45                    | 2.45                    | 0             |
| Class 5 | 198.60                  | 199.05                  | +0.45         |
|         | 1,094.84                | 1,091.91                | −2.93         |

Railway and L & A filed a combined Railroad Annual Report Form A with the ICC for the calendar year 1969. The total net mileage change during 1969 in all classes of track for Railway and L & A combined was 4.14 miles.

Between December 31, 1961, and December 31, 1969, the net mileage change in Railway's total track structure was less than 20 miles.

Between December 31, 1961, and December 31, 1969, the net mileage change in L & A's total track structure was less than 10 miles.

The engineering characteristics of rail depend upon the type of manufacturing process, the chemical composition, and the weight. Steel rail is presently manufactured by one of two processes, the basic oxygen process and the open hearth process. The basic oxygen process is a more efficient method of steel production than the open hearth process. Prior to World War I, the Bessemer process was in general use. This process produced rails of quality inferior to those produced by the basic oxygen and open hearth processes. Rails are high carbon steel. Rails with a pattern weight of over 110 to 112 pounds normally have the following chemical composition:

Carbon ............................0.69 percent to 0.828 percent
Manganese........................0.17 percent to 1.0    percent
Silicon ..............................0.10 percent to 0.25   percent

Wear resistance and brittleness increase with increased carbon content. The pattern weight of rail installed in the track structures of common carrier railroads in the United States since 1900 has ranged from 52 to 155 pounds.

With respect to each of the taxable years in issue, Railway was required to maintain accounting records reflecting by miles the gauge of track and pattern weight of rail in place in its mainline track and to report such information to the ICC on

Schedule 517 of the Annual Report Form A. The pattern weights[54] of rail by miles in place in Railway's main line track at December 31, 1962, and December 31, 1968, were as follows:

| | Miles of main track Dec. 31— | |
|---|---|---|
| Pattern weight | 1962 | 1968 |
| 136 | 10.08 | 49.68 |
| 127 | 438.04 | 405.04 |
| 115 | 144.29 | 146.35 |
| 112 | 199.79 | 193.54 |
| 100 | 2.38 | 2.36 |
| 90 | 6.47 | 2.69 |
| 85 | 41.85 | 43.17 |
| 80 | 23.73 | 23.76 |
| 75 | 6.41 | 8.08 |
| 60 | 0.46 | 0.46 |
| | 873.50 | 875.13 |

During the taxable years in issue, the predominant pattern weight of rail in place in Railway's Northern Division, extending from Kansas City, Mo., to De Queen, Ark., was 127 pounds. During the taxable years in issue, the predominant pattern weights of rail in place in Railway's Southern Division, extending from De Queen, Ark., to Port Arthur, Tex., were 112 and 115 pounds. During the taxable years in issue, the predominant pattern weight of rail in place in Railway's Port Arthur Terminal Division main line track was 115 pounds. The predominant pattern weights of rail in the Port Arthur Terminal Division branch line tracks were 90, 85, and 80 pounds. During the taxable years in issue, the predominant pattern weight of rail in place in Railway's (Kansas City) Terminal Division main line track was 85 pounds. The pattern weight of rail in the (Kansas City) Terminal Division main line track was 85 pounds. The pattern weights of rail in the (Kansas City) Terminal Division branch line tracks were 127, 115, 112, 100, 80, 75, 70, and 65 pounds.

The elevation of Railway's track structure at Kansas City, Mo., is 800 feet above mean sea level. From Kansas City, the

---

[54]The term "pattern weight of rail" is defined as the number of pounds per linear yard of rail. Railway's and L & A's general ledger and subsidiary accounting records relating to rail have at all times relevant hereto been maintained on the basis of pattern weight.

track structure generally rises in a series of undulating grade changes to Rich Mountain near Mena, Ark., where it reaches its highest elevation of approximately 1,622 feet above mean sea level. From Rich Mountain, the track structure descends 1,100 feet in 70 miles to 500 feet above mean sea level at De Queen, Ark. From De Queen to the Gulf Coast, the track structure descends in a series of mildly undulating grade changes, reaching mean sea level at Port Arthur, Tex.

With respect to each of the taxable years in issue, L & A was required to maintain accounting records reflecting by miles the gauge of track and pattern weight of rail in place in its main line track and to report such information to the ICC on schedule 517 of its Annual Report Form A. The pattern weights of rail by miles in place in L & A's main line track at December 31, 1962, and December 31, 1968, were as follows:

|  | Miles of main track Dec. 31— | |
| --- | --- | --- |
| Pattern weight | 1962 | 1968 |
| 136 | --- | 35.33 |
| 127 | 1.01 | 12.28 |
| 115 | 136.49 | 136.44 |
| 112 | 44.71 | 50.94 |
| 100 | 16.38 | 16.38 |
| 90 | 419.10 | 367.17 |
| 85 | 15.50 | 14.65 |
| 75 | 0.50 | 0.50 |
| 70 | 0.02 | 0.02 |
|  | 633.71 | 633.71 |

During the taxable years in issue, the predominant pattern weight of rail in place in L & A's "Texas Line," extending from Farmersville, Tex., to Texas Junction, La., was 90 pounds.

During the taxable years in issue, the predominant pattern weight of rail in place in L & A's "Hope" line, extending from Hope, Ark., to Minden, La., and the "Hill Line," from Minden to Alexandria, La., was 90 pounds.

During the taxable years in issue, the predominant pattern weights of rail in place in L & A's Shreveport Line, extending from Shreveport to New Orleans, La., were 90 and 115 pounds.

As of December 31, 1961, the combined main line mileage of Railway and L & A was approximately 1,558 miles. Of this total, approximately 1,245 miles, or about 80 percent, lay in tangent

(straight) track, and approximately 313 miles, or about 20 percent, lay in curved track.

The curve in a particular segment of a railroad track is measured by the degree of the central angle which is determined by the intersection at the center of the curve of two lines. These lines extend from either end of a 100-foot chord (straight line) both ends of which touch the curve. The 313 miles of curves on the main line of Railway and L & A at December 31, 1961, ranged from 0° 1′ to 10°.

The standard length of a segment of rail in use by common carrier railroads in the United States is 39 feet. The three principal parts making up the rail section are the head, the web, and the base, the head being the top part of the rail on which the trains roll, the base being the bottom of the rail, which is attached with plates to the ties, and the web being the thinner, middle part of the rail between the head and the base. With respect to 85-, 90-, 112-, and 127-pound rail, the base of the rail constitutes approximately 40 percent of the total area and weight. The area and weight of the web vary from 21 percent to 25.1 percent; the area and weight of the head vary from 42 percent to 35.1 percent, depending upon the pattern weight of the rail.

Rails in place in the track structure are connected by angle bars which are placed on either side of the rail web at the point of the juncture of two contiguous rails. The angle bars are fastened together by bolts running through the webs of the rails. The contact area between the angle bar and the head and the base of the rail are referred to as "fishing surfaces."

Tie plates are metal plates which are placed between the base of the rails and the crossties to distribute the load and to prevent the rails from cutting into the ties. The tie plates are affixed to the crossties by large metal spikes, and a portion of the head of the spikes rests on the base of the rail holding it firmly in place.

The surcharge or loading of trains, including locomotives and freight cars, passing over the track structure causes physical wear and tear upon the track structure, including the rails, angle bars, tie plates, and crossties.

The principal wear with respect to the rail portion of the track structure occurs on the head of the rail, specifically on the inner or gauge side of the rail where the flange of the metal wheel contacts the rail. Wear also occurs on the fishing surfaces

between rail ends and angle bars and between the base of the rails and the tie plates. Rail wear is evidenced by the wearing down of the rail at the points of contact, as described above, resulting in an accompanying loss of weight. The continuing contact between the flange of the metal wheels of locomotives and freight cars and the gauge side of the head of the rail wears down the contour of the rail. Rail on curved track wears more rapidly than rail on a tangent track.

The outer rail in a curve is placed at a higher elevation than the inner rail in order to counteract the effect of the centrifugal force generated by the passing of a train around the curve. The effect of such centrifugal force is to throw the wheels of the train cars against the outside of the curve, placing more pressure on the outside rail and wearing it away faster than the inner rail. The head of the inside rail on the curve is flattened.

Rail wear occurs on those portions of track with ascending gradient[55] because of the slippage in obtaining traction going uphill and on those portions of track with descending gradient in obtaining braking action going downhill. The application of sand to the rail to obtain additional traction where needed on grades and in braking also causes additional wear on the rail.

Unstable grading and underlying soil conditions cause the track structure to sub-surface and get out of line, which results in low joints. Low joints cause end batter and other rail wear.

Wear on rail produces a loss of weight in the head, web, and base of the rail, the majority of the loss occurring in the head area. Wear on the head of a rail is measured in terms of the percentage of weight loss from the original pattern weight of the head portion. The weight loss is directly proportional to the loss of area of the railhead. The amount of railhead wear can be measured by an instrument known as a caliper and by visual inspection.

When the head of the rail is 20 percent or more worn away, the flange of the rail wheel begins to strike the angle bars on the gauge side of the rails. The striking of the angle bars by locomotive and/or freight car wheels sometimes causes broken flanges, broken angle bars, loose joints, and derailments.

As the area of the railhead decreases, the frequency with

---

[55]Gradient is a percentage expressed by the rise or fall in feet per 100 feet of horizontal distance.

which the rail wheels strike the angle bars increases, with a resulting increase in operational hazards. An individual experienced in railroad track maintenance can determine with a reasonable degree of accuracy the percentage of head wear in a particular segment of track by visual inspection of the rail and angle bars. In determining whether a particular segment of rail was suitable for continued use in Railway's and L & A's track structure, the criterion applied by Railway and L & A during the taxable years in issue was primarily the degree of wear on the railhead.

Under the relay rail policies followed by Railway and L & A during the taxable years in issue, rails were generally, but not always, classified as scrap if 25 percent or more of the railhead was worn away; if more than 20 percent but less than 25 percent of the railhead was worn away, such rails were classified as relay rail.

The initial determination of whether a particular segment of rail to be released in connection with a planned relay by Railway and L & A was relay rail or scrap rail was generally made by visual inspection and caliper measurements by engineering employees during their regular inspections while the rails were in place in the track structure.

After the segments of rail were taken up, a determination was then made with respect to each individual rail as to whether such rail was relay rail or scrap rail. Rail released from the track structure and classified as relay rail was generally loaded onto flatcars and transported to the relay site. Rail released from the track and classified as scrap was generally sold alongside the track to scrap dealers.

With respect to each planned relay during the taxable years in issue, the accounting and engineering records maintained by Railway and L & A reflected the number of linear feet of relay rail relaid in the track structure by pattern weight and location, and the amounts to be expensed or to be capitalized as additions and betterments, based upon an assigned amount of $30 per ton.

The value of a relay rail is dependent upon the amount of service life remaining in the individual rail at the time it is released from the track structure. A rail which has sustained a loss of 25 percent of the cross-sectional head area will have sustained an average overall loss of 10 percent of its pattern

weight. Scrap rail is sold on the basis of scale (actual) weight and not pattern weight.

The process of releasing rail from one location in the track system and relaying it in another location in the system is frequently referred to as the "cascading" of rail. Generally, the rail is removed from a high-density traffic area, such as the main line, to a lower-traffic density area, such as a branch line or yard.

The general relay rail policy of Railway and L & A at all times relevant hereto was to derive a very high portion of the total service life of new rail at the location of its original installation, and to cascade the rail only once. The term "relay rail" did not in general refer to a single rail but normally involved a planned relay of a mile or more of tangent track, or all of the rail necessary to relay a particular curve. When a planned relay was contemplated, normally the section foreman would submit a report to the roadmaster. Together they would inspect the rail involved and submit a report to the division engineer. The roadmasters had responsibility for a district usually consisting of about 100 miles of track and they inspected their districts at least twice weekly; the section foremen were responsible for about 20 miles of track, which increased over the period here involved to 50 or 60 miles, and which they came in contact with daily. If the amount of worn rail was large, the division engineer would make a report to the chief engineer and a decision was made with respect to the planned relay.

Under the aforesaid general relay rail policy of Railway and L & A, rail was taken up for relay from its original location when it had sustained approximately 20-percent cross-sectional head wear. Rail which has sustained 20-percent cross-sectional head wear has exhausted 80 percent of its service potential since rail with 25-percent cross-sectional head wear is scrap.

Arthur D. Little, Inc., prepared a report for the U.S. Department of Justice and the Internal Revenue Service dated September 1973, entitled "The Value of Relay Rail." The Little Report states that the proper formula to determine the value of relay rail should take into account the following factors:

(a) The amount to be assigned to the worth-as-rail factor should be 35.7 percent of the difference between the value of new rail and scrap rail;

(b) The value of scrap rail should be 90 percent of the value employed by the

Internal Revenue Service to account for the weight of rail that may be lost through use.

Petitioner's witness, Thomas S. Carter, president of Railway and L & A, a professional engineer having approximately 35 years of experience in the rail industry, and familiar with Railway's and L & A's relay rail policies, made a study of the engineering principles involved in the valuation of relay rail under such policy and prepared a report for this case entitled "Development of a Formula to Determine Value of Relay Rail on KCS Lines."

Carter's report sets forth the following algebraic formula for the valuation of relay rail released from Railway's and L & A's track structures and relaid as additions and betterments during the taxable years in issue:

$$VR = .9VS + .2 (VN - .9 VS)$$

where:

VR = Value of relay rail ($/net ton)
VN = Value of new rail ($/net ton)
VS = Value of scrap rail ($/net ton)

Relays which may be required prior to the occurrence of 20-percent head wear, as a result of various metallurgical defects in the rail, such as transverse defects, engine burns, compound fissures, bolt hole defects, and others, are not taken into account in Carter's formula.[56]

## ULTIMATE FINDINGS OF FACT

The amounts to assign to relay rail are properly determined by reference to fair market value. The proper formula to be applied is:

$$V = .25 (N - .9S) + .9S$$

where:

V = fair market value of relay rail
N = price of rail new
S = price of rail for scrap based on pattern weight

---

[56]Petitioner's expert witness, Daniel H. Stone, manager of the metallurgical section of the Association of American Railroads Technical Center, and a candidate for a doctor of philosophy degree in metallurgical engineering, testified that, in his opinion, Carter's formula is sound from an engineering standpoint. He believes that it is conservatively stated, however, because it does not take into account the formation of metallurgical defects and the necessity to remove rails because of those defects before all of their "wear life" has been exhausted.

## *Issue III. Relay Rail*

### OPINION

Throughout the years at issue, Railway and L & A used the retirement-replacement-betterment (RRB) method of accounting, both for book and tax purposes, and in accordance with that method, determined the amounts of allowable deductions with respect to property in their track accounts, including rail. During these taxable years, Railway and L & A picked up and relaid 10,085 tons and 6,085 tons of rail, respectively, which they charged to track accounts as additions and betterments. (Such rail is referred to herein as relay rail.) For RRB purposes, Railway and L & A assigned to relay rail an amount of approximately $30 per ton.[57] Respondent seeks herein to assign greater amounts to the relay rail,[58] resulting in increased taxable income for Railway and L & A during the years at bar.[59]

Succinctly stated, the relay rail issue is whether, under the RRB method, the proper amount (i.e., salvage value) to be assigned to rail released from the track system and relaid as additions and betterments during the years at issue is to be determined by reference to the cost of the released rail, as petitioner contends, or by reference to its fair market value, as respondent contends.

Respondent's position in this regard[60] has been the subject of considerable litigation, and the courts have been consistent in upholding respondent's use of fair market value to determine the salvage value of relay rail. The most recent opinion of this Court on this subject is *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 732–739 (1980), in which we followed our prior opinions in *Seaboard Coast Line Railroad Co. v. Commissioner*, 72 T.C. 855 (1979), affd. per curiam 645 F.2d 72

---

[57]The precise amounts used during the taxable years in issue varied from $28.22 to $38.73 (Railway) and from $28.22 to $47.09 (L & A).

[58]Respondent seeks to assign amounts ranging from $72.48 to $85.66 per ton in the case of Railway and from $72.41 to $81.78 per ton in the case of L & A.

[59]For a discussion of how, under the retirement-replacement-betterment method, the assigning of a greater amount to relay rail will increase taxable income, see generally *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 732–733 (1980).

[60]See Rev. Rul. 67–145, 1967–1 C.B. 54; Rev. Proc. 68–46, 1968–2 C.B. 961.

(5th Cir. 1981), and in *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. 962 (1976), affd. as to this issue 641 F.2d 435 (6th Cir. 1981). We have considered petitioner's extensive arguments, and we see no reason to depart from the position which we adopted in those cases.

Other courts have also reached the conclusion that the salvage value of relay rail for RRB purposes is its fair market value at the time it is picked up. See *United States v. St. Louis—San Francisco Railway Co.*, 537 F.2d 312 (8th Cir. 1976), affg. an unreported opinion (E.D. Mo. 1975, 35 AFTR 2d 75–1317, 75–1 USTC par. 9395); *Missouri Pacific Railroad Co. v. United States*, 204 Ct. Cl. 837, 497 F.2d 1386 (1974); *Chicago, Burlington & Quincy Railroad Co. v. United States*, 197 Ct. Cl. 264, 455 F.2d 993 (1972), revd. on another issue 412 U.S. 401 (1973).

In sum, we are in agreement with the fair-market-value approach advanced herein by respondent.[61] The rationale for our conclusion is set forth at length in the cited opinions. We believe this matter is now well settled and warrants no additional discussion.

We next turn to the question of how to calculate the fair market value of the relay rail at issue herein. Respondent argues that the proper method for valuation of the rail is that set forth in Rev. Proc. 68–46, 1968–2 C.B. 961. That revenue procedure permits railroads to determine the salvage value of relay rail "at an amount equal to the average of the market price for such track materials new, and the market price for such track materials as scrap, as of the taxable year of recovery." This method of valuation may be expressed in terms of a formula as follows:

$$V = .50 (N - S) + S$$

where:

$V$ = value of relay rail
$N$ = price of rail new
$S$ = price of scrap rail

---

[61] We note that in *Seaboard Coast Line Railroad Co. v. Commissioner*, 72 T.C. 855, 885–887 (1979), affd. 642 F.2d 1211 (5th Cir. 1981), the argument that the use of fair market value resulted in the creation of income in the form of unrealized appreciation was rejected by the Court. However, the opinion also concludes that the Commissioner was "incorrect in his determination for 1961 to the extent that his adjustment exceeds the total deduction claimed." 72 T.C. at 885. To the extent that our opinion in *Seaboard Coast Line* in this regard has any application on the facts of the instant case, it will be given effect in the proceedings under Rule 155, Tax Court Rules of Practice and Procedure.

Petitioner points to the arbitrary nature of respondent's approach and argues that his formula should be modified to comport with the evidence which it has presented herein. Petitioner relies on *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. 352, 384–393 (1975), hereinafter referred to as the *"C & O"* case. In that case, we held that the taxpayer's evidence warranted the use of the following formula to value the relay rail there at issue (64 T.C. at 392):

$$V = .30 (N - .9S) + .9S$$

where

$V$ = fair market value of relay rail
$N$ = price of rail new
$S$ = price of rail for scrap based on pattern weight

In arriving at this variation of the Commissioner's formula, we concluded that there should be a modification of scrap value by a factor of .9 to account for the difference in the pattern weight used by the Commissioner and the actual weight by which the scrap rail was in fact sold. We also concluded in *C & O* that the Commissioner's formula should be adjusted downward to reflect 30 percent rather than 50 percent of the price difference between new and scrap rail. In making this latter modification, we took into account all matters of record, including (1) evidence showing the useful life of rail, based upon gross tonnage of freight, and (2) the prices at which relay rail was in fact being sold. See 64 T.C. at 391–392.

As in the *C & O* case, the evidence in the present case warrants a modification of scrap value by a factor of .9 to account for the difference between the pattern weight of rail and the actual weight at which it was sold. We believe the record establishes that, due to wear, the original pattern weight of petitioner's scrap rail was reduced by 10 percent.[62]

We further conclude, as we did in *C & O*, that a downward adjustment is warranted in the .50 factor used in respondent's formula.

In making such an adjustment, we have considered, among

---

[62]The adjustment by a factor of .9 presumes that the price of scrap rail is based on its original pattern weight. Obviously, to the extent that the scrap price is determined by reference to the *actual* weight of the rail, no such modification is required.

other things, petitioner's evidence relating to the useful life of rail, based on the percentage of head wear. The record establishes that it was petitioner's general policy to consider rail to be scrap quality if 25 percent or more of the head had worn away, and to consider it to be relay quality if 20 percent of the head had worn away. While petitioner's method of calculating useful life by reference to head wear differs from the approach adopted by the taxpayer in the *C & O* case, the two methods are not necessarily incompatible. The evidence in this case, including the authoritative testimony of petitioner's witnesses, supports the view that head wear is the most accurate way of measuring the useful life of rail.[63]

We are not dissuaded from this conclusion by the contrary evidence presented by respondent.[64] Although respondent places great stress on millions of ton miles as a measure of wear, his expert witness ranked that the lowest of the factors to be considered in determining rail wear.[65] We conclude that wear on the head of the rail is the most relevant factor in determining whether rail is to be treated as relay or scrap. Petitioner's policy was to cascade rail only once, because petitioner's lines have a very small percentage of branch lines which are usually designated as relay rail territory. We do not have a situation where

---

[63]See also, The Value of Relay Rail, A Report Prepared for the United States Department of Justice and the Internal Revenue Service, at page 15. This report, prepared by Arthur D. Little, Inc., in September 1973, is hereinafter referred to as the "Little Report."

[64]Respondent's expert witness testified that the rail failure rate as determined through electronic detection devices was the best criterion for determining whether a section of track should be relaid. However, he could cite no authority of any nature in support of that opinion. He also agreed that rail head wear was a factor to be considered although he contended that head wear could not be reliably determined by visual observation except on curves where it is generally agreed the most rapid wear occurs and where wheel flange impact on angle bars is easily noted.

The expertise of respondent's expert witness, Galbraith, lay more in areas other than the measurement of surface wear of rail by visual observation. His principal experience lay in the detection of latent defects in rail through the operation of special railroad cars equipped with electronic equipment and the welding of rail on the Santa Fe Railroad. The Santa Fe had about 13,000 miles of main line track, more than 6 times that of petitioner, and it had had no main line track under 136-pound since 1955. Galbraith had never seen any part of petitioner's railroads nor had he ever observed wear on 127-pound rail except in pictures. We find his testimony with respect to visual observation of wear on rail of little worth.

[65]The Little Report indicates that the data required to verify the analytical models of annual tonnage carried are simply not available and points out that some aspects of rail degradation are more a function of time (corrosion, pitting, etc.) than tons carried.

elimination of double track produces relay rail with considerable remaining useful life and having high value.[66] We find persuasive the testimony of petitioner's president and former chief engineer, Thomas S. Carter, that the petitioner's policy with respect to cascading was carried out and that, in relay programs undertaken, those charged with the task of distinguishing relay rail from scrap were capable of performing that duty. Section foremen worked daily with the rail in their district. Their primary function was to inspect rail. The roadmasters were required to inspect track, among other things, at least twice weekly. The district engineer was involved in the determination of whether rail was to be replaced. There is substantial evidence that it was petitioner's general practice to pick up and reuse rail with a head loss of 20 percent and to dispose of as scrap rail with a head loss of 25 percent. This evidence is convincing that the .50 factor used in respondent's formula is excessive as applied to petitioner.[67]

The following statement appearing in the *C & O* case has application here as well (64 T.C. at 391):

> As is the situation in virtually every valuation case, an elaborate discussion of the evidence and the relative weight of the various judgmental factors taken into account in reaching the final result is a fruitless exercise giving rise to a misleading inference that value is susceptible of determination with mathematical precision. In fact, it represents at most a practical judgment based upon all the materials that are properly before the Court.

Accordingly, upon consideration of the entire record, it is our best judgment, and we have found as a fact, that the fair market value of petitioner's relay rail is an amount arrived at by using the following formula:

$$V = .25 (N - .9S) + .9S$$

where:

$V$ = fair market value of relay rail
$N$ = price of new rail
$S$ = price of scrap rail based on pattern weight

Our finding is based on the evidence presented in this record in respect of this petitioner[68] and is so limited.

---

[66]Cf. *Seaboard Coast Line Railroad Co. v. Commissioner, supra* at 888.

[67]Cf. *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. 352, 391 (1975).

[68]We have given consideration to the formula proposed by petitioner but have found it deficient in various respects. One significant problem with that formula is that it fails to take

## Issue IV. Grading Useful Life

### FINDINGS OF FACT

During the years in controversy, petitioner paid or accrued certain amounts[69] relating to the grading[70] of roadways. Generally, these expenses were incurred in connection with (1) the addition of new tracks and/or the lengthening of tracks in a railroad yard, (2) the extension of passing tracks paralleling main track, (3) the connection of industry-owned track to railroad-owned track, (4) the filling-in of areas previously traversed by a bridge, and (5) the extension of spur tracks.

The amounts paid or accrued by Railway, L & A, and Fort Smith-Van Buren for grading additions were capitalized and accounted for in their books and records in Property Account 3, Grading (hereinafter referred to as account 3), as prescribed by the Interstate Commerce Commission (ICC) in its Uniform System of Accounts for Railroad Companies. The amounts paid or accrued by Tolmak for grading additions were capitalized for purposes of depreciating said amounts.

The ICC and the Internal Revenue Service have historically treated account 3 as consisting of "depreciable" and "nondepreciable" portions. Costs paid or accrued by petitioner for masonry,

---

into account the market in relay rail. Although the market in used rail is thin, we cannot agree with petitioner that it should be given no consideration. See *Seaboard Coast Line Railroad Co. v. Commissioner, supra* at 881; *Chesapeake & Ohio Railway Co. v. Commissioner, supra* at 392.

We note that petitioner appears to regard the formula set forth in the text, above, as acceptable. In its exceptions document, petitioner states that it "takes no exception to the formula determined by the Special Trial Judge to be applicable to the relay rail of Railway and L & A * * * if the amounts to be assigned are properly to be determined by reference to fair market value."

It is anticipated that, in the computation under Rule 155, Tax Court Rules of Practice and Procedure, petitioner will be given the benefit of any adjustment based on the 20-year amortization provision of Rev. Proc. 68–46, 1968–2 C.B. 961. See *Seaboard Coast Line Railroad Co. v. Commissioner, supra* at 885 n. 30.

[69]The total amounts involved are as follows:

| | |
|---|---|
| Railway | $1,114,146.09 |
| L & A | 312,477.37 |
| Fort Smith-Van Buren | 6,792.75 |
| Tolmak | 41,713.99 |
| | 1,475,130.20 |

[70]"Grading" refers to the addition of soil to or the removal of soil from the roadway for the purpose of developing suitable grade and support upon which ballast, ties, and track are laid. In addition, the word "grading" includes the preparatory operations of "clearing" and "grubbing" which must be performed prior to the actual grading of the soil, as well as the construction of protection for the roadway which is performed after the actual grading is completed.

riprap, timber, pipe, and miscellaneous embankment protection items have been ratably depreciated. The remainder of petitioner's investment in account 3 has been considered "nondepreciable" for ICC and Federal income tax purposes.

With respect to each of its taxable years 1962 through 1969, inclusive, Railway's basis in the "depreciable" and "nondepreciable" portions of its account 3 were as follows:

| TYE Dec. 31— | "Depreciable" basis | "Nondepreciable" basis |
|---|---|---|
| 1962 | $639,220 | $11,858,195 |
| 1963 | 639,195 | 11,807,889 |
| 1964 | 550,503 | 11,846,129 |
| 1965 | 540,628 | 11,854,025 |
| 1966 | 537,826 | 11,840,480 |
| 1967 | 511,931 | 11,850,710 |
| 1968 | 510,119 | 11,841,193 |
| 1969 | 489,532 | 11,853,384 |

With respect to each of its taxable years 1962 through 1969, inclusive, L & A's bases in the "depreciable" and "nondepreciable" portions of its account 3 were as follows:

| TYE Dec. 31— | "Depreciable" basis | "Nondepreciable" basis |
|---|---|---|
| 1962 | $89,172 | $4,414,640 |
| 1963 | 84,172 | 4,414,573 |
| 1964 | 84,172 | 4,410,553 |
| 1965 | 84,172 | 4,405,690 |
| 1966 | 84,172 | 4,402,810 |
| 1967 | 84,172 | 4,396,010 |
| 1968 | 84,172 | 4,390,544 |
| 1969 | 84,172 | 4,389,676 |

On its Federal income tax returns for the taxable period ended October 31, 1962, and the taxable years ended December 31, 1963, to December 31, 1969, inclusive, petitioner claimed investment credit with respect to amounts totaling $1,475,130.20 which were paid or accrued by Railway, L & A, Fort Smith-Van Buren, and Tolmak to unrelated third parties during such taxable years for grading additions. In his statutory notices of deficiency, respondent disallowed the investment credit on the basis that grading is "not depreciable property."

On November 3, 1975, petitioner amended its petitions in all docket numbers to claim additional deductions for depreciation of the "nondepreciable"[71] portions of Railway's and L & A's accounts 3, Grading. Petitioner pleaded average remaining useful lives for Railway and L & A grading placed in service prior to January 1, 1962, and average whole lives for grading placed in service during the taxable years in issue. Petitioner claimed overpayments in various amounts arising out of the additional depreciation deductions for Railway and L & A.[72]

Various factors affect petitioner's grading, including moisture, settlement, subsidence, liquefaction, and the effect of loads and rail traffic. Some grading is more adversely affected by these conditions than is other grading of petitioner, and varying degrees of maintenance are required.

The condition of the line and the operation of trains are affected by the physical condition of the grading. When grading fails, the track settles unevenly, causing the rails to become uneven and out of alignment. Soil heaves on each side of the ties and water pumps up between the rails. Low joints develop in the rails, and derailments related to the failing grading occur. Drainage problems develop. Cars lean because the grading has failed and the track is out of alignment. The speed limit in the failing areas is reduced. Abnormal maintenance is required, and maintenance costs increase.

Petitioner's grading has been retired from service for a variety of causes. These causes can be generalized into two ultimate classifications: (1) Line abandonments, and (2) line changes. Lines are abandoned or changed because of physical inadequacy, shifting industry and population centers, eminent domain, changing technology, management policies, and economic factors.

As of 1962, it was probable that these causes of grading retirements experienced by petitioner in the past would recur in

---

[71]Deductions claimed with respect to the "depreciable" portions of the accounts are not here in issue. All further references herein to "account 3," or to "grading" are to the "nondepreciable" portions of the accounts unless otherwise stated.

[72]No additional depreciation was claimed by petitioner for Fort Smith-Van Buren and Tolmak grading. Petitioner concedes that the grading costs incurred by Fort Smith-Van Buren ($6,792.75) and Tolmak ($41,713.99) during the taxable years in issue do not qualify for depreciation or investment credit.

future years. Certain of these causes recurred during the period from 1963 to 1976.

The impact of unit coal trains (trains carrying coal exclusively) on Railway and L & A, beginning in the fall of 1976, will require more line changes than have occurred in any period in the past. Excessive curves and grades will need to be eliminated in order to operate unit coal trains safely and competitively. Several line changes are already underway or in the planning stages to accommodate the unit coal trains. Centralized traffic control has been installed on part of the line and has continued to be installed over other segments of the line.

In addition to unit coal trains, changing freight patterns will probably increase the tonnage carried by Railway and L & A. Increases in the quantities of paper, automobiles, plastics, and grain carried over Railway and L & A are expected in the future. The energy crisis is expected to produce a flow of tonnage back from trucks to rails as well as stimulate the construction of at least one new refinery along the L & A line.

Grading has had no salvage value to petitioner upon retirement. In certain instances, railroads have been required to degrade retired grading; in such cases the grading has been a liability and the salvage value, if any, has been negative. In those instances in which grading is retired from petitioner's account 3 because of a sale, the sales price has been established on the basis of the recoverable metallics, i.e., rail, angle bars, and tie plates, and not the grading.

Past grading retirements demonstrate that the useful life of petitioner's grading is not perpetual. Grading retirements occurred each year on Railway from 1915 to 1974 (with the exception of 1957) having a cost of $982,162. Between 1918 and 1974, L & A retired grading having a cost of $2,574,718.

In connection with the present case, studies were conducted for petitioner in which statistical analyses were made of petitioner's grading retirements, and projections were made regarding the anticipated service (useful) life of such grading. These estimates of the useful life of Railway's and L & A's grading were made for petitioner by two of the most knowledgeable and experienced individuals in the field of life analysis and life estimation—John J. Reilly and Robley Winfrey, both consulting engineers.

Both Reilly and Winfrey employed the actuarial method of life analysis in their studies of Railway's and L & A's grading.[73] Of the two general methods of life analysis—the actuarial method and the turnover method—the most accepted and reliable is the actuarial method. The wide acceptance of the actuarial method is due to the refined data upon which this method is based. While the turnover methods of analyzing historical retirements employ only gross additions and gross retirements, the actuarial method identifies the actual ages of property retired and property surviving. This use of "aged data" allows for a more detailed and, hence, more reliable analysis of past retirement experience.

Reilly and Winfrey each presented a study of the useful lives of Railway's and L & A's grading based upon data gathered by employees of petitioner pursuant to the guidelines established by Reilly and Winfrey. Reilly's report contains tables of data under study, charts showing the application of the selected Iowa-type curve to the stub survivor curves, and an explanation of the methodology employed and the results of his study. Winfrey's report consists of charts showing his handdrawn stub survivor curves based upon the data presented in Reilly's report and his findings with respect to the average service lives of Railway's and L & A's grading.

Step one of the actuarial method employed herein for petitioner involved data gathering and refinement, which was accomplished by employees of petitioner at the direction of Reilly and Winfrey. Pursuant to their directions, petitioner's employees prepared schedules of additions to account 3, retirements from the account, and the ages of retirements at the date retired. These schedules included data from the original year of construction to and including December 31, 1974. It was necessary to determine the year of construction for grading placed in service prior to the ICC valuation dates[74] because prior

---

[73]The actuarial method is described in *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. 352, 372–375 (1975). See also *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 783–786 (1980). It is unnecessary for us to repeat in depth the discussions contained in those cases.

[74]Pursuant to the Physical Valuation of Property Act, Mar. 1, 1913, 37 Stat. 701, 49 U.S.C.A. sec. 19(a) (1970), the ICC conducted an inventory and valuation of the property owned or used by Railway and its predecessor companies as of June 30, 1914, and by L & A and its predecessor

to 1914, most railroads, including Railway and L & A, did not maintain records of the costs of individual items in their road property accounts. The method of relating prevaluation grading to the original year of construction, as well as the procedures used by petitioner in gathering and refining the additions and retirements data, was found by both Reilly and Winfrey to be proper for the purpose of making life analysis studies.[75]

The second step involved the development of a life table and survivor curve. In general terms, this step entailed the arrangement of the data derived in step one into five tables which made possible their analysis. Each table summarizes the data for a different retirement band, i.e., a span of years over which retirements are analyzed. Different retirement bands were used to enable Reilly and Winfrey to determine whether an increasing or decreasing trend of average life was evident for account 3.

Based upon the life tables,[76] Reilly and Winfrey independently plotted on graph paper the percentage surviving at the beginning of each age interval. These stub survivor curves, although drawn to different scales by Reilly and Winfrey, are identical in shape because they were plotted from the same life tables.

After Reilly and Winfrey plotted the stub survivor curves on graph paper, each independently overlaid the Iowa-type curves on the plotted stub curves for the purpose of carrying out step three of their method—smoothing and extending the stub survivor curve. For each of the 10 retirement bands under study, a curve was selected which, in the expert judgments of Reilly and Winfrey, best fitted the stub survivor curves. Based upon

---

companies as of June 30, 1917. These dates are referred to as Railway's and L & A's "valuation dates."

[75]Respondent has stipulated that such data "accurately reflect Railway's and L & A's additions to and retirements from * * * Account 3 (Grading) for the purpose of petitioner's estimation of the probable average lives of Railway's and L & A's investments in said accounts 3." The data under study in this case and the procedures and methods used in gathering and refining that data, therefore, are not in dispute.

[76]Because the arrangement of the data into tables was a purely mechanical operation, Winfrey used the tables prepared by Reilly in his study.

Respondent's witness on the grading issue, Ronald J. Bartyczak, did not challenge the accuracy of the computations or the method used by Reilly and Winfrey in developing the life tables and stub survivor curves. Indeed, Bartyczak used the data as arranged in Reilly's tables as the basis for his own report in this case. This fact, together with Reilly's unassailed testimony regarding the life tables and resultant stub survivor curves, demonstrates that no question exists concerning the propriety of the execution by petitioner's witnesses of step two of the actuarial method.

their analyses, Reilly and Winfrey each identified a trend toward a decreasing average life for Railway's grading. As the retirement bands were contracted, overall average life shortened. Reilly's and Winfrey's independent band analyses establish that Railway's grading retirements have occurred with greater frequency during the more recent retirement bands.

With respect to L & A, Reilly's and Winfrey's band analyses demonstrate a similar, although less pronounced, shortening of life as the retirement bands are contracted. As the bands were contracted, both Reilly and Winfrey identified a similar trend toward a shorter life for L & A until the 1963–74 band, in which the average life was greater than that of previous bands, although there are slight differences between Reilly and Winfrey in the specific lives chosen for each band.

Step four involved the application of judgment. Judgment is necessary to interpret the extent to which historical service lives may be altered by future developments. The application of judgment must be performed by an analyst familiar with the type of property under study, past and expected future causes of retirements, and management policies and plans for the future. Based upon this knowledge, the analyst can adjust the historically determined average service life in accordance with his judgment concerning the extent to which the rate of future retirements will increase or decrease over the past retirement rate. The application of judgment to determine future average service life is called "life estimation."

In considering the impact of probable future developments which would affect the lives of Railway's and L & A's grading, Reilly and Winfrey made visual inspections of the grading. They also consulted with Railway and L & A employees regarding factors affecting grading retirements—past, present, and future. Thomas S. Carter, president of Railway and L & A, indicated the causes of line changes and line abandonments and pointed to their recurring nature. He emphasized that present projections of the future impact of unit coal trains and new types of freight and freight cars will require numerous changes in the location and structure of the present lines. Unit coal trains will require more line changes than Railway and L & A have experienced in any period in the past. New technology, Federal legislation encouraging the consolidation of duplicate lines, and

changes in the economy will also lead to line changes and line abandonments in the future.

In taking into account the impact of probable future developments, Reilly and Winfrey did not substantially modify the historically determined lives of Railway's and L & A's grading. By the application of judgment to the historical band lives in his actuarial study, Reilly estimated 100 years as the expected life of Railway's grading, and 75 years as the expected life of L & A's grading. These findings are clearly within the range of the historically determined lives and are consistent with the trend toward a decreasing life as the bands are shortened. Winfrey's estimated useful lives of 95 years for Railway's grading and 80 years for L & A's grading similarly fall within the range and reflect the trend of his historically determined lives.

Based upon his knowledge of the property under study and his consultations with officials of petitioner relating to causes of retirements and future plans and policies, Winfrey applied his judgment to the historically determined lives and estimated the following average service lives of Railway's and L & A's grading reflected in the "nondepreciable" portions of their accounts 3 as of December 31, 1962:

| *Account 3—Grading* | *Average life* |
|---|---|
| Railway | 95 years |
| L & A | 80 years |

Reilly, based upon his knowledge of the property under study and his consultations with officials of petitioner relating to causes of retirements and future plans and policies, applied his judgment to the historically determined lives and estimated the following average service lives of Railway's and L & A's grading reflected in the "nondepreciable" portions of their accounts 3 as of December 31, 1962:

| *Account 3—Grading* | *Average life* |
|---|---|
| Railway | 100 years |
| L & A | 75 years |

Employing actuarial procedures to compute average remaining life for assets in service at December 31, 1962, Reilly determined the following average remaining lives for Railway's and L & A's grading reflected in the "nondepreciable" portions of their accounts 3 at December 31, 1962:

*Account 3—Grading*        *Average remaining life*
      Railway ............................. 63 years
      L & A................................. 48 years

Respondent's expert witness, Ronald J. Bartyczak, used the same retirement data used by petitioner's expert witnesses, Winfrey and Reilly. The method-of-life analysis employed by Winfrey and Reilly used survivor ratios. The method-of-life analysis employed by Bartyczak used retirement rations, i.e., the complement of the survivor ratios in Reilly's report. Bartyczak's analysis and extension of the retirement data to project a probable average service life for petitioner's grading employed a curve fitting by least squares of polynomial equations to the retirement ratios. Bartyczak's projection of a probable average service life of petitioner's grading from an analysis of the historical data assumes that future retirements will be affected by the same forces affecting past retirements.

### ULTIMATE FINDINGS OF FACT

Railway and L & A are entitled to depreciate the "nondepreciable" portions of the accounts 3, Grading, over the following useful lives:

| | *Balance at* | *Additions after* |
|---|---|---|
| *Account 3—Grading* | *Dec. 31, 1962* | *Dec. 31, 1962* |
| Railway............................ 63 | | 100 |
| L & A............................. 48 | | 75 |

Railway's and L & A's grading is other tangible property used as an integral part of furnishing transportation services and is property with respect to which depreciation is allowable, having a useful life of 8 years or more. Grading constructed or acquired by Railway and L & A in the respective amounts of $1,114,146.09 and $312,477.37 during the taxable years in issue qualifies as "new section 38 property" for purposes of the investment credit.

## Issue IV. Grading Useful Life

### OPINION

This issue involves petitioner's claim that it is entitled to depreciation deductions under section 167[77] and investment credits under section 38[78] for certain of its grading. The applicability of these sections is dependent upon our determination of whether petitioner's grading has a reasonably determinable useful life over which its cost can be allocated. If so, petitioner is entitled to deductions under section 167 and to credits under section 38.[79] *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 788–807 (1980); *Spartanburg Terminal Co. v. Commissioner*, 66 T.C. 916, 925–932, 935–938 (1976); *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. 352, 376–384 (1975). As we pointed out recently in the *Southern Pacific* case, the taxpayer's estimates need not be made with precision. 75 T.C. at 790. "A reasonable approximation of the amount that fairly may be included in the accounts of any year is all that is required." *Burnet v. Niagara Falls Brewing Co.*, 282 U.S. 648, 655 (1931).

In the *Southern Pacific* and *Chesapeake & Ohio* cases, the taxpayers used statistical studies and projections to show that

---

[77]In part, sec. 167 states:

There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, * * *

[78]Sec. 38 allows a credit against tax for a taxpayer's investment in certain property. The property for which a credit is allowed is described in sec. 48, which, during the years at issue, read in part as follows:

SEC. 48 (a). SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction, or of furnishing transportation, * * *

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more.

[79]It is apparent from the language of sec. 48, quoted in the preceding footnote, that to the extent "depreciation * * * is allowable" under sec. 167 for petitioner's grading, the grading will be viewed as "Section 38 Property" for investment credit purposes (assuming "a useful life * * * of 4 years or more"). Cf. *Spartanburg Terminal Co. v. Commissioner*, 66 T.C. 916, 935–938 (1976).

their grading would, in the course of time, lose utility and be retired from service. The evidence in both cases showed that grading had a reasonably determinable useful life, permitting a reasonable approximation of the allowable annual deduction under section 167. While neither of the cases states a rule of general application regarding the depreciability of grading, they clearly stand as precedent for the proposition that statistical methods can properly be used to establish the useful life of grading for tax purposes. See also *Pennsylvania Power & Light Co. v. United States*, 188 Ct. Cl. 76, 411 F.2d 1300 (1969), and *Virginia Electric & Power Co. v. United States*, 188 Ct. Cl. 120, 411 F.2d 1314 (1969).[80] We believe the facts of the instant case are similar to the facts (relating to the useful life of grading) in the *Southern Pacific* and *Chesapeake & Ohio* cases, and we conclude that a similar result should obtain in this case. We will not repeat herein the various matters recently dealt with at length in the *Southern Pacific* opinion except to note that the principles outlined and the authorities cited in our discussion of the grading issue therein have guided us in the resolution of the present controversy.

The facts in this case clearly show that Railway's and L & A's grading is subject to the forces of obsolescence identified in section 1.167(a)–9, Income Tax Regs. Between 1915 and 1974, Railway retired grading having a cost of $982,162; between 1918 and 1974, L & A retired grading having a cost of $2,574,718. The causes of the retirements analyzed by petitioner fall within two general classifications: (1) Line abandonments and (2) line changes. Railway's and L & A's lines have been abandoned or changed because of physical inadequacy,[81] shifting industrial and

---

[80] We take note of the report of the trial judge in *Burlington Northern, Inc. v. United States*, No. 3072 (Tr. Div. Ct. Cl., Nov. 6, 1980, 46 AFTR 2d 80–6004, 80–2 USTC par. 9781), containing the trial judge's recommended conclusion of law in accordance with Court of Claims rule 134(h). See also Court of Claims rule 147(b).

[81] We believe that, with proper maintenance, railroad grading ordinarily has an indeterminate *physical* life. See *Southern Pacific Transportation Co. v. Commissioner, supra* at 774; *Chesapeake & Ohio Railway Co. v. Commissioner, supra* at 370, 379. Thus, "wear and tear," as that term is used in section 167, is not generally a factor which has a bearing on grading useful life. Nevertheless, it is clear that grading can deteriorate physically in adverse conditions and can require high levels of costly maintenance. In such a situation, the decision to retire a line is based largely on economic considerations and not on the physical exhaustion of an asset. As in

population centers, eminent domain,[82] changing technology, management policies, and economic factors. Based on all of the evidence of record, as outlined in our findings of fact, we hold that petitioner has established useful lives for its grading (added after December 31, 1962) of 100 years (Railway) and 75 years (L & A), with average remaining lives for grading in existence on December 31, 1962, of 63 years (Railway) and 48 years (L & A).

The projections by petitioner's expert witnesses do not significantly shorten the historically determined lives of the grading. Petitioner's witnesses have not claimed, and petitioner does not now claim, that petitioner's projections of future developments are entirely accurate or precisely measurable. Rather, petitioner has estimated, based upon a demonstrated historical trend toward a shortened life and upon an informed evaluation of foreseeable future developments, the expected lives of Railway's and L & A's grading.[83] This is all that the law requires.

To the extent respondent argues that petitioner's projections

the *Southern Pacific* case, we believe petitioner may properly take such retirements into account in connection with its analysis for obsolescence purposes. *Southern Pacific Transportation Co. v. Commissioner, supra* at 795–796.

[82]To some extent, petitioner's statistical analysis appears to have taken into account retirements occasioned by condemnations. This fact was brought out in the report of the Special Trial Judge, and respondent has filed no exception in this regard. As a result, we have made no inquiry herein as to whether, on the facts of this case, such retirements should properly have been included in petitioner's analysis. Compare *Southern Pacific Transportation Co. v. Commissioner, supra* at 798–799.

[83]Respondent presented as an expert witness, Ronald J. Bartyczak, a mathematical statistician, "to establish the radical degree of assumptions employed by petitioner's experts in the life estimation phase of their life analyses." Bartyczak devised a "regression analysis based on the data set out in petitioner's expert witness John J. Reilly's study as "a mere statistical exercise." Bartyczak's major assumption was that "the future would exactly track the past." He did not have an understanding of the property under study. Not only had he not inspected the grading of petitioner, he also was not certain what railroad grading was. He had no opinion on the projections of future development testified to by Carter, Railway's president. In contrast, petitioner's expert witnesses did have an understanding of, and had inspected, the grading. They compared the data under study to that of industrial properties and they took into consideration "present conditions and probable future developments." Sec. 1.167(a)–1(a) and (b). Petitioner's expert witness, John J. Reilly, is a recognized expert in the field of actuarial methods of life analysis. He has had long experience in using Iowa-type curves in the determination of average probable service lives. Bartyczak had never used Iowa-type curves for the purpose of determining average probable service life.

Based on his assumption that the "future would exactly track the past," Bartyczak projected an average service life for petitioner's grading ranging from a low of 78 years to a high of approximately 900 years, depending on the particular railroad and retirement band studied. On brief, respondent states that the only purpose of respondent's expert was to establish the radical degree of assumption employed by petitioner's experts in the life-estimation phase of their life analyses.

are in some manner tainted by speculative elements entering into the analysis, we believe he is in error. The factors considered by petitioner are within the contemplation of section 1.167(a)–9, Income Tax Regs., which specifically mentions "progress of the arts and sciences, * * * inadequacy brought about by developments in the industry, products, methods, markets, sources of supply, and other like changes, and legislative and regulatory action." See also section 1.167(a)–1(b), Income Tax Regs., stating that, in estimating useful life a taxpayer should "[take] into account present conditions and probable future developments." The pertinent regulations reflect the need to look into the future, however unsusceptible of precise prediction the future may be. Based on all of the evidence of record, it is our conclusion that it could reasonably be anticipated that grading retirements by Railway and L & A would continue and, in fact, would increase.

In summary, we conclude that, through the use of the actuarial method of life analysis involving the application of Iowa curves, petitioner has shown that the useful life of its grading is reasonably determinable, taking into account the character of past retirements and petitioner's reasonable expectations regarding future retirements. Petitioner has shown that the grading of Railway and L & A is depreciable property and that its grading additions during the taxable periods in issue comply in all respects with the requirements for "new section 38 property." As a result, petitioner is entitled to the section 38 investment credit with respect to such additions.[84] Moreover, petitioner has established the depreciable bases of Railway and L & A in the "nondepreciable" portion of their ICC grading accounts and has established that the salvage value of the grading at issue is zero.[85] Petitioner is therefore entitled to depreciation deductions in accordance with the provisions of section 167.

One additional point must be mentioned. Respondent contends

---

[84]Respondent does not argue to the contrary if these requirements are met.

[85]For the purposes of computing depreciation deductions with respect to their accounts 3, Railway and L & A are required to reduce the amounts subject to depreciation, i.e., their costs, by the salvage value of the grading, if any, at retirement. Sec. 1.167(a)–1(c), Income Tax Regs. The uncontroverted evidence proffered by petitioner clearly established that Railway's and L & A's grading has no salvage value upon retirement.

that petitioner's claim for ratable depreciation of the grading in issue constitutes a change in petitioner's method of accounting for which the necessary consent has been neither requested nor given.[86] See sec. 446(e). A similar accounting method argument was made by respondent in the *Southern Pacific* case in connection with the grading useful life issue involved therein. For the reasons expressed in the *Southern Pacific* opinion, we hold that the adoption of ratable depreciation in the present case is not a change in method of accounting. Based on a change in underlying facts, petitioner is assigning a useful life to an asset whose life was previously indeterminate. See sec. 1.446–1(e)(2)(ii)(*b*), Income Tax Regs. Under these circumstances, petitioner is not required to obtain consent pursuant to section 446(e). *Southern Pacific Transportation Co. v. Commissioner*, *supra* at 802–807.

*Decisions will be entered under Rule 155.*

---

[86]An oral motion was made by respondent on May 17, 1976, for leave to amend his pleading by June 16, 1976, to assert that the claim for ratable depreciation on grading constitutes a change in method of accounting. Pursuant to the Tax Court Rules of Practice and Procedure, respondent filed a written motion on May 19, 1976, for leave to file his amendment to answer. This motion was granted. Petitioner was given 45 days to respond either by motion or reply. On July 16, 1976, respondent filed an amendment to answer to amendment to petition with the Court. On Aug. 16, 1976, petitioner filed a reply with the Court. The record was held open for the filing of these documents.

Petitioner argues on brief that this matter is not properly before the Court and, alternatively, that respondent has not met his burden of proof. In light of the foregoing recitation, we do not agree that this accounting method argument is not properly before the Court. It seems to us that petitioner has not stated its objection in a timely fashion. Moreover, this question is strictly a legal one and has been fully addressed by petitioner on brief. Petitioner is therefore not prejudiced by our consideration of respondent's theory. In any event, our conclusion as to this accounting method question is not affected by considerations of burden of proof. See *Southern Pacific Transportation Co. v. Commissioner*, *supra* at 680–681 and 805.